UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARIA CEJA,<br><br>　　　　　Petitioner,<br><br>　　v.<br><br>DERRAL G. ADAMS,<br><br>　　　　　Respondent. | No. 1:17-cv-00291-LJO-SKO (HC)<br><br>**FINDINGS AND RECOMMENDATIONS TO GRANT IN PART AND DENY PETITION FOR WRIT OF HABEAS CORPUS AND DECLINE TO ISSUE CERTIFICATE OF APPEALABILITY**<br><br>**(Doc. 1)** |

Petitioner, Maria Ceja, is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner alleges five grounds for habeas relief: (1) violation of her rights pursuant to *Miranda v. Arizona*;[1] (2) the trial court improperly allowed two investigating officers to sit through the trial; (3) the trial court improperly allowed Petitioner's co-defendant to participate in her defense; (4) jury instruction error; and (5) ineffective assistance of counsel. The Court referred the matter to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rules 302 and 304. Having reviewed the record as a whole and applicable law, the

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

undersigned recommends that the Court grant the petition as to ground one and deny the petition as to grounds two through five.

## I.    <u>Factual and Procedural Background[2]</u>

Petitioner and her codefendant, Jose Augustine Velarde ("Velarde"), were tried together for the murder of Ana Diaz de Ceja ("Ana") and the kidnapping of her infant son, Anthony.

Petitioner and Velarde lived together in Planada, a small town in eastern Merced County. Both Petitioner and Velarde had three children each from previous relationships. Petitioner's three children lived in the home Petitioner shared with Velarde, but Velarde's three daughters did not live there.

Velarde wanted a child with Petitioner, particularly a son. Petitioner told friends in late 2010 that she was pregnant, although a pregnancy test taken on August 31, 2010 was negative.

The victim, Ana, and her husband Luis also lived in Planada, with their five-year-old son, Luis, Jr., and two-month-old son Anthony. Ana and Petitioner were acquaintances.

In late November 2010, Jesus Castillo ("Castillo") was sitting on a park bench in south Merced when a woman stopped in an old, brown car and whistled to get his attention. Castillo walked to the passenger side of the car. The woman was alone and there was a baby car seat in the back of the car. The woman offered Castillo $1,500 to "rob a baby and hit the lady." The woman stated the baby was her nephew and she did not want the baby staying with his mother. Castillo declined and the woman said she would look for someone else and left.

Several weeks later, Castillo saw Petitioner on the television news and thought he recognized her. Castillo later identified the woman he spoke to in the park as Petitioner in a photo lineup.

---

[2] The factual background, taken from the opinion of the California Court of Appeal, Fifth Appellate District, *People v. Ceja*, (F067979) (Cal. App. Mar. 11, 2016), is presumed to be correct. 28 U.S.C. § 2254(e)(1).

On December 1, 2010, Petitioner and Ana saw each other at Planada Elementary School. Ana was holding her son, Anthony. The two spoke about scarves Petitioner made and sold, and made plans for Ana to go to Petitioner's house the next day to look at the scarves. During the conversation, Petitioner told Ana that she was pregnant.

That evening, Ana told her sister-in-law that Petitioner was pregnant and due any day. Ana's sister-in-law thought this was odd because she had seen Petitioner at the post office a month earlier and Petitioner did not look pregnant. Ana told her sister-in-law she was going to Petitioner's home the next day to look at Petitioner's scarves.

The next morning, December 2, 2010, Ana's mother-in-law walked Luis Jr., Ana's five-year-old son, to the school bus stop by 6:55 a.m., as she did every weekday. When she left the house, Ana's son, Anthony, was still asleep. Around 7:45 a.m. on that same day, a neighbor saw Ana place something into the backseat of her running vehicle, a blue Chevrolet Avalanche.

Petitioner's co-defendant, Velarde, arrived to work at a farm southeast of Planada at approximately 7:00 a.m. on December 2, 2010. A few hours later, he asked a co-worker for a ride home because he had a dentist appointment. Velarde told his co-worker that Petitioner could not pick him up because they had family members at their house. The co-worker drove Velarde home, and Velarde did not return to work until the following Monday, December 6, 2010.

On the morning of December 2, 2010, a man driving on Highway 59 drove by a car parked on the side of the road. He stopped and asked the woman in the car if she needed help. He saw a baby car seat on the passenger's side of the car covered in blankets, but was not sure if there was a baby in it. The woman appeared nervous and stated she was waiting for her husband. At trial, Petitioner admitted she was approached by a man as she was parked alongside a road, waiting for Velarde.

At 10:00 a.m. on December 2, 2010, an almond grower, delivering paychecks to his employees near one of his almond orchards, saw two cars approaching from the opposite direction, driving slowly and in tandem. A Hispanic man wearing a baseball cap was driving the lead vehicle, a Chevrolet Avalanche, the same type of car Ana drove. A Hispanic female followed the Avalanche in a Ford Crown Victoria or Mercury Grand Marquis. Ten minutes later, the almond grower saw the woman heading back the opposite direction, traveling at a normal speed, in the Crown Victoria or Grand Marquis, with a man in the passenger's seat. The Avalanche was later found abandoned in one of the almond grower's orchards. At approximately the same time, one of the orchard workers saw a fire 30 rows away. He did not think much about it, because "they're always burning [something]."

Between 11:00 and 11:30 a.m., Ana's mother-in-law noticed that Ana's car was not at her house, so she met Ana's older son, Luis Jr., at the bus stop. Ana's failure to meet her son at the bus stop was uncharacteristic of her.

As the orchard workers who had noticed a fire in the orchard earlier in the morning moved closer to the fire around 2:00 that afternoon, they smelled burnt flesh. Two workers walked toward the smoke and discovered a charred body. They notified the foreman, who called the police.

At 2:27 p.m., a Merced County sheriff located the charred body. The body was completely burned, with little visible flesh. A shoe impression was photographed at the scene. Additionally, officers found tire impressions 20 to 25 feet from the body, which led to the main roadway.

Around 4:00 p.m., California Highway Patrol responded to a call of a burning vehicle and found a Crown Victoria still smoking in an almond orchard outside Atwater, California. The car was registered to Petitioner.

4

Later in the afternoon of December 2, 2010, a woman walking on a bike path in Merced saw a baby car seat. She notified police after seeing an online article about a missing baby. At trial, Ana's brother identified the baby car seat as belonging to Anthony.

At 5:00 p.m., a woman later identified as Petitioner, and a man later identified as Velarde, appeared on a surveillance tape using Petitioner's EBT card at Walmart in Merced. Petitioner was holding something covered in a blanket. A receipt showed the couple purchased baby bottles, diapers, and a baby car seat, as well as other supplies and clothing.

At 6:00 p.m., Petitioner reported her tan Crown Victoria had been stolen from her driveway while she was away from her house. When the highway patrol officer took the report, he knew the vehicle had already been recovered in an almond orchard outside Atwater.

Between 7:00 and 8:00 p.m., Ana's husband called the police and reported his wife, Ana, and son, Anthony, missing. Telephone records from Petitioner and Velarde's cell phones showed that on December 2, 2010, Velarde made two short calls to Petitioner at 7:30 a.m. and one call at 8:11 a.m. Between 9:12 a.m. and 10:06 a.m., there were 14 calls between the two cell phones. Although the calls stopped for three hours, from 1:05 p.m. to 4:00 p.m. there were 43 additional calls between the two phones.

The following morning, December 2, 2010, Petitioner and a Hispanic man arrived at a towing yard where the Crown Victoria was stolen. Petitioner and the man inspected the trunk of the vehicle for a few minutes and then left.

Around midday on December 3, 2010, Ana's car was found in the almond orchards, approximately one and a half to two miles from Ana's body. Detectives believe the tire tracks left near the car matched tire tracks left at the scene where the charred body was discovered.

The body was identified as Ana's based on her dental records. Autopsy results indicated the cause of death as "possible asphyxia." The forensic pathologist who conducted the autopsy

concluded the body was burned after she died.

At 6:30 a.m. on December 7, 2010, in Le Grand, California, Javier Sanchez ("Sanchez") was de-icing the windshield of his car when he heard a crying sound coming from his neighbor's house. Upon investigation, he found a naked, motionless baby boy—later determined to be Ana's son, Anthony—lying in a pillowcase on the doorstep. Sanchez rang his neighbor's doorbell and gave the woman who answered the door, Aurelia Garcia ("Garcia"), the baby. The baby's head was shaved and he was cold and stiff. Garcia and two family members held the baby and warmed him using body heat and heated towels. By the time paramedics arrived at 7:01 a.m., Anthony had begun to move. Paramedics treated Anthony for hypothermia.

On December 8, 2010, police learned Petitioner's cousin called a local newspaper with a tip about her. The cousin later told officers he had been at a park on a date not specified in the record, when he saw Petitioner drive away in her Crown Victoria. When the cousin later spoke to his friend, Castillo, who was also at the park, Castillo told him Petitioner offered him money to kidnap a baby. Petitioner's cousin had heard about burglaries Petitioner had been involved in and believed Petitioner was trying to raise money to pay someone to kidnap a baby.

Castillo later went to the sheriff's office and told them about the November incident in the park, when a woman offered to pay him money to kidnap a baby. On December 15, 2010, police officers showed Castillo a photographic line-up in which he identified Petitioner as the woman in the park.

A partial tire tread from Petitioner's Crown Victoria was compared to the tire impressions left at the site where Ana's Avalanche was discovered, and the impressions appeared to have been left by the Crown Victoria's tires.

On December 15, 2010, police officers executed a search warrant at Petitioner and Velarde's home. Officers found diapers, baby bottles, wipes, clothing, and other infant

6

paraphernalia. They also found a photograph in the living room of Petitioner and Velarde in which Petitioner appeared to be pregnant. Two sonogram images were attached to the photo. One sonogram had Petitioner's name, but the date of the sonogram was removed. Officers also found a calendar which listed December 2, 2010—the day Ana was killed and Anthony was kidnapped—as "Junior's B-Day." Petitioner and Velarde were arrested later that day.

Two police officers interviewed Petitioner. At the beginning of the interview, Petitioner stated she understood Spanish better than English, "For me is better in Spanish." (Clerk's Transcript 7 at 1476.) Although one of the police officers spoke Spanish, the officers continued to interview Petitioner in English and read Petitioner her *Miranda* rights in English only. The following exchanged occurred when Petitioner was read her *Miranda* rights:

Det. Brawley: Okay, um but, I have to tell you. You have the right to remain silent. Anything you say may be used against you in court. You have the right to the presence of an attorney, and if you cannot afford an attorney, one will be appointed to you free of charge before any questioning, if you wish. You understand these rights as I've explained them?

Petitioner: Uh-huh.

Det. Brawley: You understand? Is there anything you don't understand about that, what I've just read to you?

Petitioner: Uh, mejor en Español.
(Uh, it's better in Spanish.)

Det. Ruiz: You understand it?

Le entendistes?
(Did you understand it?)

Petitioner: Si entiendo poquito pero no entiendo tanto.
(I understand it a little bit, but I don't understand that much.)

Det. Ruiz: Okay, pero si entendiste lo que te dijo?
(Okay, but you understood what he told you?)

Petitioner: Pues que tengo derecho a permanecer callada y a un abogado, no?
(Well, that I have the right to remain silent and to an attorney, right?)

7

| | |
|---|---|
| Det. Ruiz: | Uh-huh. |
| Det. Brawley: | You understand? |
| Petitioner: | Uh-huh. |

*Id*. at 1478-79.

Although Petitioner's *Miranda* rights were not read to her in Spanish, throughout the interview, Petitioner spoke to the detectives primarily in Spanish. Petitioner gave several versions of the events that took place on December 2, 2010. She first denied ever seeing Ana, stating she had gone to see a relative out of town. However, she did acknowledge she made scarves and had seen Ana the day before at the elementary school. Petitioner next claimed Velarde had gone with her out of town, that her car was stolen while they were gone, and that Velarde's co-worker may have been involved in Ana's death.

In Petitioner's third version of events, she claimed that Ana and Anthony were at her house and two gangsters tried to carjack Ana. Not wanting to upset her husband if her car was taken, Ana stayed with the car and the gangsters took her. Petitioner stated she held onto Anthony until she and Velarde left him five days later. According to Petitioner, the gangsters also took her car and threatened to kill her.

After police officers confronted Petitioner with the information that she had tried to solicit someone to kidnap a baby and "hit" the mother for $1,500, Petitioner said Ana had somehow fallen over a scarf and hit her head and died. Petitioner said Velarde was at the house when it happened. She acknowledged it was Velarde who was at Walmart with her that evening.

Eventually, Petitioner implicated Velarde in the murder of Ana and stated it was all his fault. Petitioner said Velarde choked Ana to death and Petitioner did not help because she was holding the baby. Petitioner stated Velarde threatened to kill her and rape her daughter if she did not help him dispose of Ana's body.

Petitioner also admitted she attempted to buy a baby and knew a woman who was having a baby she did not want, although the woman's husband wanted the baby. Petitioner and the woman then conspired to fake a kidnapping so Petitioner could get the baby. During this time, Petitioner faked a pregnancy. Petitioner blamed Velarde, claiming she did it to give him a son.

Petitioner acknowledged that after holding Anthony on December 1, 2010, at the elementary school, she decided that she wanted him. She admitted she saw Velarde put on latex gloves and then kill Ana.

Petitioner told police officers she and Velarde eventually decided to drop the baby off at an address where they saw a lady outside with "kids" and she seemed "nice." She said it was Velarde's idea to drop the baby off even though it was near freezing outside.

During Velarde's interview, he also gave police officers several different versions of events. First, Velarde stated he was at work all day and came home to find Petitioner's Crown Victoria had been stolen. He acknowledged he was the one who accompanied Petitioner to the towing yard to look at the Crown Victoria on December 3, 2010.

When Velarde was asked about the woman who was missing, he claimed he did not know the victim, but had heard about her through coworkers. Velarde stated Petitioner was not pregnant at that time, but had suffered three miscarriages and had lost a baby recently in her eighth month of pregnancy. Eventually, Velarde admitted he had gone to Walmart with Petitioner on December 2, 2010. Velarde stated Petitioner was in charge of purchases for the family and "in charge of everything in general."

When confronted with evidence that Ana had been at his home on the morning of December 2, 2010, Velarde said he had come home because Petitioner had said she was sick. Once home, Petitioner told him Ana had been at the house to look at scarves and had fallen. Velarde first maintained Ana had left by the time he got home. Velarde next stated she was sitting on the couch

9

talking to Petitioner when he got home. When confronted with his story that Ana had fallen, Velarde said she was still breathing when he first saw her and he checked her pulse. He denied the baby was with her.

During the interview, when asked about specifics. Velarde often said "[Petitioner] already told you," or "[w]hy are you asking me?"

Velarde eventually admitted he loaded Ana's body into the trunk of the Crown Victoria and he and Petitioner drove it to the site where the body was dumped and burned. Petitioner drove the Crown Victoria and Velarde drove Ana's Avalanche. Velarde continued to maintain Ana's death was an accident and Anthony was not with them.

Finally, Velarde admitted Ana had the baby with her at the time she was killed. He acknowledged that he purchased gasoline and used it to set Ana's body on fire after dumping the body in the orchard. Velarde stated he "did what he had to do."

After dumping the body, Velarde and Petitioner returned home, changed clothes, and drove the Crown Victoria to a different orchard. Petitioner followed Velarde in their Chevy Tahoe. At the orchard, Velarde burned the Crown Victoria and the clothing they had worn earlier.

Velarde admitted he strangled Ana by pinning her hands to her sides with his feet and using both hands to strangle her. He thought the whole process took about 10 minutes. Velarde stated he re-named Anthony after himself.

Prior to trial, Velarde filed a motion to sever his trial from Petitioner's, citing *Aranda-Bruton*,[3] because both Petitioner and Velarde gave post-arrest statements to detectives that would

---

[3] Pursuant to the *Aranda-Bruton* rule, in a joint trial, it is error to admit an admission by a non-testifying defendant that incriminates a codefendant, even if the jury is instructed not to consider the hearsay as evidence against the codefendant. *People v. Aranda*, 63 Cal.2d 518, 528-30 (1965) (finding that the admission of a confession implicating co-defendant in joint trial resulted in a miscarriage of justice notwithstanding an instruction that the confession was admissible only against confessing defendant); *Bruton v. United States*, 391 U.S. 123, 126 (1968) (finding that the admission of a confession implicating co-defendant in joint trial constituted prejudicial error even when the trial court gave a clear jury instruction that the confession could only be used against confessing defendant and must be disregarded with respect to the co-defendant).

likely be introduced by the prosecution. The trial court denied the motion; instead, impaneling two juries. The juries were separately selected and heard separate opening statements and closing arguments. The two juries heard the prosecution's evidence at the same time, with the exception that Velarde's jury was excluded when Petitioner's post-arrest statement implicating Velarde was presented to the jury. Velarde's post-arrest statement was presented to both juries, because Petitioner waived her right to confrontation and allowed the statement to be played.

At trial, Petitioner testified in her own defense, before both juries, that she had been molested as a child and was the victim of domestic and sexual abuse and violence by each of her three husbands and partners, including Velarde.

Petitioner testified Velarde wanted a son, but Petitioner could not conceive because she had a tubal ligation following the birth of her last child. In 2010, Velarde told Petitioner he was having an affair with a woman and asked Petitioner to fake a pregnancy. Velarde later said he was going to have a son with his mistress and Petitioner believed the mistress would relinquish custody of the unborn child. Velarde threatened to hurt Petitioner's daughter if Petitioner did not go along with the plan. Petitioner claimed that when she went to the park to ask a man to kidnap a baby, she was doing so at Velarde's direction.

Petitioner met Ana and Anthony at the elementary school on December 1, 2010, and they tentatively planned to have Ana go to Petitioner's house the next day to look at scarves. When Petitioner told Velarde that Ana was coming to the house the next day, Velarde confessed that Ana was the woman with whom he had had the affair and the baby, Anthony, was his son. Velarde instructed Petitioner to call him when Ana arrived so he could talk to her. Velarde also instructed Petitioner to tell her children she was going to have a baby the next day at the hospital. Petitioner followed Velarde's instructions.

When Ana arrived the next morning at 8:00 a.m., Petitioner called Velarde, who came

11

home. Petitioner invited Ana into the bedroom to look at photographs. When Velarde arrived, Petitioner excused herself to give Velarde and Ana time to talk. When Petitioner returned, Velarde was on top of Ana with his hands around her neck. Petitioner asked Velarde what he was doing and told him to call an ambulance, but Ana was already dead. Petitioner did not call the police because she believed Velarde would kill her as well.

Velarde carried Ana's body out of the house, came back in, and told Petitioner to follow him in the Crown Victoria. They left Ana's Avalanche in an almond orchard and then traveled together to the place where Velarde burned Ana's body. The couple then went home, changed their clothes, and went to another almond field where Velarde burned the Crown Victoria. Finally, they went to Walmart for baby supplies and then the creek where they disposed of Anthony's baby car seat.

Several days later, Velarde agreed to leave the baby at a random house. Velarde had shaved Anthony's head so he would not be recognized. He refused to dress the baby, but agreed to wrap him in a pillowcase.

Petitioner denied having any plans to kill Ana or kidnap Anthony, and denied knowing what Velarde was going to do.

In his defense, Velarde introduced evidence of an incident that occurred after Petitioner had been in custody for two years, during which she became combative and it took six or seven people to restrain her.

Petitioner's mother testified she accompanied Petitioner to a fertility clinic after the birth of her last child as she was having trouble conceiving again. Soon afterward, Petitioner told her mother she was pregnant. Her mother thought she appeared pregnant in 2010, although Petitioner's mother rarely saw her that year.

One of Petitioner's sons testified his mother had told him in 2010 that she was pregnant and

it looked like her stomach was getting bigger. He found out she had the baby on December 2, 2010, when he called home from school. His relatives came to the house and brought gifts. A few days later, his mother told him she took the baby to the hospital because he was not breathing right.

Petitioner's former husband testified that Petitioner had lied to the police about injuries he had supposedly caused, that money disappeared during their marriage for which she could not account, and that she falsely claimed he had shown their son pornography to affect his custody rights. Petitioner's former husband described her as angry, controlling, and manipulative.

Petitioner was convicted of first degree murder (Cal. Penal Code § 187(a)); kidnapping (Cal. Penal Code § 207(a)); child endangerment (Cal. Penal Code § 273a(a)); and solicitation to commit kidnapping (Cal. Penal Code § 653f(a)). The jury found true the allegations that Petitioner killed the victim by means of lying in wait, (Cal. Penal Code § 190.2(a)(15)) and during the commission of a kidnapping, (Cal. Penal Code § 190.2(a)(17)(B)), and that the victim of the kidnapping was under the age of 14 (Cal. Penal Code § 208(b)). Petitioner was sentenced to life without the possibility of parole, plus an additional consecutive term of 13 years in prison.

On March 11, 2016, the Court of Appeal for the Fifth Appellate District ("Court of Appeal") affirmed Petitioner's conviction. On June 15, 2016, the California Supreme Court denied review.

On March 2, 2017, Petitioner filed her petition for writ of habeas corpus before this Court. Respondent filed a response on July 19, 2017, and Petitioner replied on August 25, 2017.

## II.    Standard of Review

A person in custody as a result of the judgment of a state court may secure relief through a petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); *Williams v. Taylor*, 529 U.S. 362, 375 (2000). On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed thereafter. *Lindh v. Murphy*, 521 U.S. 320,

322-23 (1997). Under the statutory terms, the petition in this case is governed by AEDPA's provisions because it was filed April 24, 1996.

Habeas corpus is neither a substitute for a direct appeal nor a device for federal review of the merits of a guilty verdict rendered in state court. *Jackson v. Virginia*, 443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring). Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under AEDPA, a petitioner can obtain habeas corpus relief only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams*, 529 U.S. at 413.

"By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011).

As a threshold matter, a federal court must first determine what constitutes "clearly established Federal law, as determined by the Supreme Court of the United States." *Lockyer*, 538 U.S. at 71. In doing so, the Court must look to the holdings, as opposed to the dicta, of the Supreme Court's decisions at the time of the relevant state-court decision. *Id.* The court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.* at 72. The state court need not have cited clearly established Supreme Court precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it. *Early v. Packer*, 537 U.S. 3, 8 (2002). The federal court must apply the presumption that state courts know and follow the law. *Woodford v. Visciotti*, 537

14

U.S. 19, 24 (2002). The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996).

"A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Thus, the AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102.

### III. The State Court Erred in Admitting Petitioner's Post-Arrest Statements

In her first ground for habeas relief, Petitioner contends her waiver of her *Miranda* rights and subsequent statement to police were involuntary, because she is a Spanish speaker and her rights were read to her in English. (Doc. 1 at 9.) Respondent counters that fair minded jurists could agree that Petitioner understood her *Miranda* rights and voluntarily, knowingly, and intelligently waived them. (Doc. 19 at 28.)

#### A. Standard of Review

The Supreme Court held in *Miranda v. Arizona*, that certain warnings must be given if a suspect's statements made during custodial interrogation are to be admitted in evidence. 384 U.S. 436 (1966). Once a person is properly advised of their rights, they may waive them voluntarily, knowingly, and intelligently. *Id.* at 475. Rights are voluntarily waived when the waiver was the product of a free and deliberate choice, rather than by intimidation, coercion, or deception. *Colorado v. Spring*, 479 U.S. 564, 573 (1987). To knowingly and intelligently waive, means that

the defendant was aware of "the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

"Whether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of the defendant." *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986) (citing *North Carolina v. Butler*, 441 U.S 369, 374-75 (1979)). "[A]ny language difficulties encountered by the defendant are considered to determine if there has been a valid waiver." *Id.* at 751-52 (citing *United States v. Heredia-Fernandez*, 756 F.2d 1412, 1415 (9th Cir. 1985).

Even if the undersigned finds the trial court erred in admitting Petitioner's statements based on an invalid waiver of her *Miranda* rights, Petitioner is not entitled to habeas relief on this claim unless the constitutional error had a "substantial and injurious effect or influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (9th Cir. 1993) ("the standard for determining whether habeas relief must be granted is whether the . . . error had a substantial and injurious effect or influence in degerming the jury's verdict." (internal quotation marks omitted) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)).

**B. State Court of Appeal Opinion**

Before the Court of Appeal, Petitioner argued her waiver of her *Miranda* rights and statements to police were not made knowingly, because she was "an uneducated and Spanish speaking woman," who "was given her *Miranda* admonitions in English and questioned mostly in English although . . . the officers knew she was more comfortable in Spanish and one officer was fluent in Spanish." *People v. Ceja*, (F067979) (Cal. App. Mar. 11, 2016), at 14-15. The Court of Appeal rejected Petitioner's *Miranda* claim.

The Court of Appeal noted that Petitioner had filed a motion in limine to exclude her statement to police, arguing her *Miranda* waiver was not voluntary, knowing, or intelligent. The

trial court held a suppression hearing, at which

> Detective Brawley testified he had been a peace officer for 11 years and a detective for about four years. Over that time, he frequently came into contact with people who spoke languages other than English. When he executed the search of [Petitioner's] home on December 15, 2010, he contacted [Petitioner] and spoke to her in English. She responded in English and her answers were appropriate and responsive to his questions. Based on his experience, he believed she could comprehend and he could effectively and accurately communicate with her in English.

> Detective Brawley also made contact with Velarde and immediately recognized that "there was clearly a language barrier," so no conversation ensued between the two.

> When Detective Brawley asked [Petitioner] if she would come to the investigations office in Merced, she agreed and rode unrestrained in Detective Brawley's vehicle. While in the vehicle, the two conversed in English. She at times initiated conversation herself and never indicated she had any difficulty understanding English. During that conversation she told Detective Brawley she had suffered abuse in the past with other boyfriends and "had put one or both of them in jail." The conversation in the vehicle was recorded.

> Once at the investigations office, Detective Brawley and [Petitioner] were joined by Detective Ruiz, who spoke Spanish. [Petitioner] agreed to go to the interview room, where the conversation was recorded.

> During the interview, Detective Brawley asked [Petitioner] some preliminary questions in English and she answered in English. When Detective Brawley gave [Petitioner] her *Miranda* advisement in English, she was asked if there was anything she did not understand. She replied, in Spanish, "Uh, it's better in Spanish." When asked in Spanish by Detective Ruiz if she understood, she replied, in Spanish, that she had a right to remain silent, and agreed that she understood verbally and by nodding her head.

> Detective Brawley testified that, whenever he asked [Petitioner] questions in English, she did not hesitate before responding and her response were appropriate. When [Petitioner] wanted to speak in Spanish, she was allowed to do so. Detective Brawley testified that, during the interview, he touched [Petitioner] on the knee, shoulder or arm several times as an act of positive reinforcement. None of the touches were aggressive or violent and [Petitioner] did not appear to be scared or intimidated by them.

> Detective Ruiz testified that he spoke both English and Spanish and had been a detective for about four years. In his experience he had come across people who understood a language but ha[d] difficulty speaking it. He used his own parents as an example and stated he spoke to them in English and they would respond in Spanish. According to Detective Ruiz, [Petitioner] never said she did not

understand English or that she had not understood her rights. According to Detective Ruiz, [Petitioner] said twice in English that she understood her rights and also summarized her rights in Spanish. Based on his observations, [Petitioner] understood and spoke English.

Hembree, who committed [a] burglary of [Petitioner]'s in-laws with her, testified that she spoke Spanish but was not fluent. She spoke both English and Spanish with [Petitioner] and believed [Petitioner] communicated well in English.

A sheriff's deputy who spoke with [Petitioner] on December 24, 2011, communicated with [Petitioner] in English only. She seemed to understand what he told her and responded appropriately in English.

An expert in Spanish linguistics testified in [Petitioner]'s defense that he had interviewed her and reviewed the recordings of her statements to police and opined she did not have command of the English language well enough to answer questions in English. On cross-examination, the expert admitted he was being paid by the defense for work done in connection with the case and that people who are bilingual are often better at comprehending a language than they are at speaking it.

In denying [Petitioner]'s motion to suppress, the trial court noted it had listened to [Petitioner]'s recorded interview multiple times and found her responses "immediate and questions direct and appropriate." He found [Petitioner] understood and comprehended English better than she spoke it and "exhibited little lack of understanding. When she did, she did not hesitate to ask for a clarification." The trial court found that Detective Brawley had asked [Petitioner] 193 questions in English and she answered "immediately conversationally in Spanish 146 times or 76 percent of the time." The trial court noted that [Petitioner] responded both in body language and facial expressions.

The trial court also noted that during the 20- to 30-minute car ride before the interview, [Petitioner] spoke in English on a variety of topics, revealing use of "a wide range" of words. The trial court did not find the defense expert credible.

In summary, the trial court found [Petitioner] "proficient enough in English for the purposes of Miranda," and stated:

> "[Petitioner] has been in the U.S. for decades, speaks English, has a higher than expected cognitive ability in Spanish, responded to questions in English and Spanish without hesitation, immediately in the normal flow of a conversation, demonstrating an understanding of both languages. Her desire to use her first language as the interrogation intensified is not abnormal, but, to the contrary, normal. [¶] The reading of the Miranda rights to [Petitioner] in English based on her responses, body language, repeating the gist of the rights, and coupled with the prior conversation she had with the detective solely in English in the car ride over are the acts and statements of someone who understood and comprehended what was being told to her."

The trial court noted [Petitioner] never asked for an interpreter and that she was experienced with the criminal justice system, as evidenced by her conversation in Detective Brawley's vehicle. The trial court also noted the officers made no promises to her in exchange for a confession and "[t]here were no threats, no fear, no intimidation, no coercion." The trial court concluded, "[t]he evidence and the total circumstances suggest she understood."

*Id*. at 15-18.

Analyzing the trial court's reasoning for denying Petitioner's motion to suppress, the Court of Appeal held:

To establish a valid waiver of an accused person's right to counsel and to remain silent, the People are required to show, by a preponderance of the evidence, the accused voluntarily, knowingly, and intelligently waived such rights. (*People v. Sims* (1993) 5 Cal.4th 405, 440)[.] As a reviewing court, we determine the validity of the waiver by evaluating the "totality" of the circumstances, including background, experience, conduct of the defendant, "any language difficulties," and defendant's age. (*People v. Michaels* (2002) 28 Cal.4th 486, 512; *United States v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 751-752.)

In *Moran v. Burbine* (1986) 475 U.S. 412, the United States Supreme Court identified two distinct components of the inquiry:

"First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." (*Id*. at p. 421.)

On appeal, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence. (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)

[Petitioner]'s claim of unknowingly waiving her rights is based on an alleged lack of comprehension of her rights due to an inability to fully understand English. But the record directly belies her claim. Detective Brawley, Detective Ruiz and Hembree testified regarding [Petitioner]'s ability to comprehend and communicate effectively in English. The trial court also found this to be the case after watching the recorded interviews. And finally, there was a Spanish-speaking officer present throughout the interview and yet [Petitioner] never asked him to translate for her. While [Petitioner] may have been more comfortable speaking in Spanish, it did not mean she did not understand English sufficiently for *Miranda* purposes. (See

*United States v. Bernard S., supra*, 795 F.2d at p. 752; see also *Campaneria v. Reid* (2d Cir. 1989) 891 F.2d 1014, 1020 [defendant's limited proficiency in English did not prevent him from making a knowing and intelligent waiver of his constitutional rights].)

We find [Petitioner]'s case distinguishable from *United States v. Garibay* (9th Cir. 1998) 143 F.3d 534 (*Garibay*), on which she relies. In *Garibay*, the defendant spoke only a few words in English, did not seem to understand what was being said to him, had no previous experience with the criminal process, and had received a "borderline retarded" score following standardized intelligence testing. (*Id.* at pp. 537-539.) The record here, in contrast, amply supports the trial court's finding that [Petitioner]'s command of the English language was sufficient for her to have understood the *Miranda* advisement given her and then voluntarily, knowingly, and intelligently decided to speak with the detectives. We reject [Petitioner]'s claim to the contrary.

[Petitioner] also claims that her statements to Detective Brawley and Ruiz were involuntary due to "police overreaching and coercion." Specifically, [Petitioner] contends the questioning by two law enforcement officials and their acts of touching her shoulder and knee were coercive because she had been sexually abused since childhood and, as the detectives were aware, had been the subject of domestic abuse. We find no coercive tactics were employed in order to obtain [Petitioner]'s waiver of her rights.

The prosecution is barred by the federal and state constitutions from using a defendant's involuntary confession. (*People v. Massie* (1998) 19 Cal.4th 550, 576; *Jackson v. Denno* (1964) 378 U.S. 368, 376.) The waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*Moran v. Burbine*, *supra*, 475 U.S. at p. 421.)

Turning to the facts here, we reject [Petitioner]'s assertion that waiver of her *Miranda* rights was involuntary because it was the product of intimidation or coercion. There is no indication that the simple acts of touching her knee or shoulder, which the detectives testified they had done only a couple of times during the interview as a means of positive reinforcement, were in any way aggressive, threatening or violent. [Petitioner] never voiced any objections to them during the interview. [Petitioner] did not appear to have been under any undue pressure from the investigating officers.

We find no coercive tactics were employed in order to obtain [Petitioner]'s waiver of her rights and reject her claim to the contrary.

*Id.* at 18-20.

## C. **Admission of Petitioner's Statements Was Objectively Unreasonable**

The United States Supreme Court has identified two components to determine whether a waiver was voluntarily, knowingly, and intelligently made:

> [f]irst, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986).

Petitioner argues that her waiver fails under both components, because she did not knowingly and intelligently waive her *Miranda* rights and her statements were coerced.

### 1. __Involuntary Waiver__

Petitioner first argues that her waiver was not voluntary because she primarily speaks Spanish and her *Miranda* rights were read to her in English. (Doc. 1 at 9-10.)

One factor for the Court to consider in determining whether a *Miranda* waiver was knowingly and intelligently made is any language difficulty during custodial interrogation. *Heredia-Fernandez*, 756 F.3d at 1415 (holding that "language difficulties may impair the ability of a person in custody to waive [his *Miranda*] rights in a free and aware manner"). The trial court found Petitioner "proficient enough in English for the purposes of Miranda," stating:

> [Petitioner] has been in the U.S. for decades, speaks English, has a higher than expected cognitive ability in Spanish, responded to questions in English and Spanish without hesitation, immediately in the normal flow of a conversation, demonstrating an understanding of both languages. Her desire to use her first language as the interrogation intensified is not abnormal, but, to the contrary, normal. [¶] The reading of the Miranda rights to [Petitioner] in English based on her responses, body language, repeating the gist of the rights, and coupled with the prior conversation she had with the detective solely in English in the car ride over are the acts and statements of someone who understood and comprehended what was being told to her.

*Ceja*, (F067979), at 17-18. Further, the trial court noted that Petitioner never asked for an interpreter and was experienced with the criminal justice system. *Id.* at 18.

The Court of Appeal distinguished the case of *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998), which Petitioner relied on, from Petitioner's case. In *Garibay*, the Ninth Circuit found a defendant with "low IQ and poor English-verbal comprehension" did not "understand the nature

21

of the rights he was waiving;" therefore, it found the trial court erred in not suppressing his statements. *Id*. at 539. The district court relied on two facts to find the defendant was proficient in English: "(1) [the defendant] allegedly declined the agents' offer to be questioned in Spanish; and (2) [the defendant] attended high school in California and opted for an English-only curriculum." *Id*. at 537.

Contrary to the district court's findings, however, the Court of Appeal in *Garibay* determined the defendant was not offered the option of conducting his interrogation in Spanish. Rather, the agent who questioned the defendant assumed he was "sufficiently proficient in English to understand and waive his *Miranda* rights without the assistance of a Spanish-speaking officer." *Id*. Further, although the defendant attended a high school in the United States, neither his grades, nor witness testimony supported a finding that he was "sufficiently proficient in English." *Id*. 537-38. The Ninth Circuit also noted that the defendant was undisputedly "borderline retarded and had difficulty understanding the English language. Additionally, the pre-sentence report confirmed [the defendant's inability to understand oral instructions." *Id*. at 538.

In addition to the above factors, the Ninth Circuit applied a "totality of the circumstances" test to examine the circumstances surrounding the defendant's interrogation. *Id*. The Ninth Circuit based its "totality of the circumstances" test on six considerations:

> (1) whether the defendant signed a written waiver, See *Bernard S.*, 795 F.2d at 752-53; *United States v. Bautista-Avila*, 6 F.3d 1360, 1365 (9th Cir. 1993); (2) whether the defendant was advised of his rights in his native tongue, *see id.*; *United States v. Gonzales*, 749 F.2d 1329, 1336 (9th Cir. 1984); (3) whether the defendant appeared to understand his rights, *see id.*; (4) whether the defendant had the assistance of a translator, *see Bernard S.*, 795 F.2d at 752-753; (5) whether the defendant's rights were individually repeated and explained to him, *see Derrick*, 924 F.2d at 824; and (6) whether the defendant had prior experience with the criminal justice system, *see Glover*, 596 F.2d at 865.

*Id*.

In *Garibay*, the Court found the defendant: (1) was not given a written waiver to sign in

either English or Spanish; (2) was not advised of his rights in Spanish; (3) translators were not brought in to help question him; (4) his constitutional rights were not individually explained to him; and (5) he had no previous experience with the criminal justice system. *Id*. at 538-39. Based on these considerations, the Court found defendant's waiver was not made knowingly and intelligently.

Here, the Court of Appeal found *Garibay* distinguishable from the case at bar, because "[Petitioner]'s command of the English language was sufficient for her to have understood the *Miranda* advisement given her and then voluntarily, knowingly, and intelligently decided to speak with the detectives." *Ceja*, (F067979), at 19. The undersigned disagrees with the Court of Appeal's analysis that the case at bar is distinguishable from the Ninth Circuit's reasoning in *Garibay*.

Based on the six considerations outlined by the Ninth Circuit in *Garibay*, the undersigned finds Petitioner's waiver was not knowingly and intelligently made. First, Petitioner did not sign a written waiver form in English or Spanish. "Although not dispositive, a written waiver of one's *Miranda* rights is 'strong' evidence that the waiver is valid." *Bernard S.*, 795 F.2d at 753 (internal citations omitted).

Second, although Petitioner told detectives she was more comfortable speaking in Spanish, her *Miranda* rights were only read in English. Detective Brawley explained this decision by stating that when he asked Petitioner to accompany him to the police station, he felt he was able to converse with Petitioner in English. (Reporter's Transcript 2 at 49-51, 54-55.) Detective Brawley described their conversation:

> initially consist[ing] of trying to provide a ride home for her son who was at a school function in – nearby in the same town. So I was making phone calls talking to other detectives and getting information from her and kind of going back and forth.
>
> But then for the duration of the car ride, we spoke briefly about the police report that she had made regarding her car having been stolen. We talked about the children that she had, their ages, the past problems that she's had with men. She touched on a little bit of abusiveness. We talked about some medical issues that

she had brought up.  It was a variety of topics.

*Id*. at 55.

However, when she was interviewed at the police station, Petitioner stated at least twice during her interview that she would prefer to speak in Spanish.  (Clerk's Transcript 7 at 1476, 1479.)  When the detectives began the interview by asking for biographical details, Petitioner stated, "For me is better in Spanish."  *Id*. at 1476.  Although Detective Brawley continued to ask questions in English, Petitioner responded in Spanish and Detective Ruiz translated.  *Id*. at 1475-1669.

After explaining they brought her to the station to talk to Petitioner about her car, Detective Brawley read Petitioner her *Miranda* rights, and the following exchanged occurred between Detective Brawley, Detective Ruiz, who spoke Spanish, and Petitioner:

Det. Brawley: Okay, um but, I have to tell you.  You have the right to remain silent. Anything you say may be used against you in court.  You have the right to the presence of an attorney, and if you cannot afford an attorney, one will be appointed to you free of charge before any questioning, if you wish.  You understand these rights as I've explained them?

Petitioner: Uh-huh.

Det. Brawley: You understand?  Is there anything you don't understand about that, what I've just read to you?

Petitioner: Uh, mejor en Español.
(Uh, it's better in Spanish.)

Det. Ruiz: You understand it?

Le entendistes?
(Did you understand it?)

Petitioner: Si entiendo poquito pero no entiendo tanto.
(I understand it a little bit, but I don't understand that much.)

Det. Ruiz: Okay, pero si entendiste lo que te dijo?
(Okay, but you understood what he told you?)

Petitioner: Pues que tengo derecho a permanecer callada y a un abogado, no?

24

(Well, that I have the right to remain silent and to an attorney, right?)

Det. Ruiz:      Uh-huh.

Det. Brawley:  You understand?

Petitioner:      Uh-huh.

*Id*. at 1478-79.

At the suppression hearing, Detective Brawley testified that he only read Petitioner's *Miranda* rights in English, rather than English and Spanish, because "that was the language that we had been communicating in for the past 20, 25, or 30 minutes prior to that, and that was clearly sufficient in my mind and in hers." (Reporter's Transcript 2 at 63.) However, Detective Brawley noted that when Petitioner stated, "better in Spanish" and noted Detective Ruiz spoke Spanish,

> it was clearly – clear to us that she did kind of want to talk to him, [Detective Ruiz,] and she began directing her answers towards him. But it was clearly because in – what it appeared to be is it was a comfort issue. She felt more comfortable talking in Spanish, and I think nobody would argue that.

*Id*. at 64-65.

During the interview, Petitioner primarily answered questions in Spanish, although Detective Brawley asked her to answer questions in English on several different occasions. The trial court noted that Detective Brawley asked Petitioner 193 questions in English and she answered "'immediately conversationally in Spanish 146 times or 76 percent of the time.'" *Ceja*, (F067979), at 17. Detective Ruiz had to translate Petitioner's answers throughout the entire interview. In sum, despite Petitioner's clear preference to speak in Spanish, Detective Brawley only read her *Miranda* rights in English.

Third, it is not clear from Petitioner's response whether she understood her *Miranda* rights. When Detective Brawley asked Petitioner if she understood her rights, she stated, in Spanish, "it's better in Spanish," and "I understand it a little bit, but I don't understand much." (Clerk's Transcript 7 at 1479.) Petitioner responded by asking, "that I have the right to remain silent and to an attorney,

right?" *Id.* However, based on the exchange as a whole, it is not clear that she understood her rights.

Fourth, in Respondent's favor, Petitioner did have the assistance of Detective Ruiz, who spoke Spanish and was able to translate Petitioner's answers to Detective Brawley. Indeed, Detective Ruiz spent the majority of the interview translating Petitioner's answers. Although Detective Ruiz spoke Spanish, he did not advise Petitioner of her *Miranda* rights in Spanish and both detectives pushed Petitioner to speak in English during the interview—despite her clear and stated preference to speak in Spanish. For example, Detective Ruiz told Petitioner to answer questions, "En Ingles (In English)." *Id.* Detective Brawley asked Petitioner to speak in English:

> Det. Brawley: Uh, can I ask that you talk in English? If you have a question, or if you have to explain in Spanish, then go ahead.
>
> Petitioner: Okay.
>
> Det. Brawley: If you need clarification in Spanish, then he'll do that, but it's just gonna be hard to every time you say something have him tell me.
>
> Petitioner: Okay.
>
> Det. Brawley: And you speak it pretty good. We were talking the whole way over here.
>
> Petitioner: Okay.
>
> Det. Brawley: Uh, and if you do that, I promise not to speak German, okay?
>
> Petitioner: German?
>
> Det. Brawley: I'm joking. I don't know German. I don't speak German, but I'm just saying.

*Id.* at 1485. The Court does note Petitioner did not ask Detective Ruiz to translate for her.

Fifth, Petitioner's rights were not individually repeated and explained to her. The Court of Appeal acknowledged Petitioner felt more comfortable with Spanish, but found "it did not mean she did not understand English sufficiently for *Miranda* purposes." *Ceja*, (F067979), at 19 (citing

*Bernard S.*, 795 F.2d at 752; *Campaneria v. Reid*, 891 F.2d 1014, 1020 (2d Cir. 1989). However, in *Bernard S.*, unlike the case at bar, knowing the defendant struggled with English, the detectives "explained each individual right" to the defendant. *Bernard S.*, 795 F.3d at 752.

Sixth, Petitioner did not have experience with the criminal justice system, despite the trial court's finding that Petitioner was "experienced with the criminal justice system, as evidenced by her conversation in Detective Brawley's vehicle." *Ceja*, (F067979), at 18. The trial court referenced Detective Brawley's testimony at the suppression hearing that Petitioner spoke to him about reporting past domestic abuse to the police. Specifically, Detective Brawley testified:

> Prosecutor: Did [Petitioner] demonstrate a familiarity with the criminal justice system during your conversation with her?
>
> Det. Brawley: Yeah. She seemed like it.
>
> Prosecutor: Why do you say that?
>
> Det. Brawley: Well, because she explained that in addition to this abuse that she had had in the past at the hands of these other boyfriends, that she had put one or both of them in jail. To me, that meant – or I took it as though she understood how to use the system – she called the police; she made reports; the police reacted. They responded taking her report, and then, in turn, it apparently resulted in somebody being arrested. So clearly she was familiar with it in my mind.
>
> Prosecutor: Did she demonstrate familiarity with the court system and other services?
>
> Det. Brawley: Yeah, I believe so.
>
> Prosecutor: Why do you say that?
>
> Det. Brawley: Well, I'm not – I don't recall for certain, but she may have had a restraining order at some point or at least being the victim of a domestic violence – again, it just kind of goes hand in hand. She utilized the resources that were available to her. She didn't sit back and take it, was my understanding of it. If she was abused, she made use of the resources available to her.

(Trial Transcript 2 at 57-58.)

The undersigned does not agree that the foregoing exchange demonstrates that Petitioner

27

had relevant prior experience with the criminal justice system. Petitioner has a history of contacting the police and using the court system to report domestic violence. However, there is nothing in the record to show she had previously been arrested or interrogated by police officers. The record does not demonstrate Petitioner had any previous experience with having been informed of her *Miranda* rights and knowledge that she could voluntarily and intelligently to waive those rights.

Based on the foregoing, the six considerations used by the Ninth Circuit in *Garibay* to "examine the circumstances surrounding" a *Miranda* waiver, the totality of the circumstances favor Petitioner.

In considering other circumstances, the Court notes that the parties stipulated that Petitioner had limited formal education, which included approximately one and a half years education in Mexico and a few months in middle school and high school in the United States. (Reporter's Transcript 3 at 360.) At all times before and during the trial, Petitioner also had a translator in court.

The undersigned notes that both detectives and a prosecution witness testified that Petitioner communicated well in English. Despite this testimony and Petitioner's limited ability to converse with the detectives in English, based on the totality of the circumstances, the undersigned does not find Petitioner "understood the nature of the rights [s]he was waiving." *Garibay*, 143 F.3d at 539. Consequently, Petitioner's waiver of her *Miranda* rights was not knowingly and intelligently made. The trial court erred in not suppressing Petitioner's statements to police.

### 2. The Error in Not Suppressing Petitioner's Statements Was Not Harmless

The Court must evaluate whether the trial court's constitutional error in admitting Petitioner's statements requires reversal of the conviction. The applicable standard is whether the error had a substantial and injurious effect or influence in determining the jury's verdict. *Brecht*, 507 U.S. at 637. "Review for harmless error requires not only an evaluation of the remaining

28

incriminating evidence in the record, but also the most perceptive reflections as to the probabilities of the effect of error on a reasonable trier of fact." *United States v. Harrison*, 34 F.3d 886, 892 (9th Cir. 1994) (internal quotation marks and citations omitted).

Respondent does not argue that if inadmissible, Petitioner's statements to the detectives were harmless. *Chapman v. California*, 386 U.S. 18, 24 (1967) ("Certainly error, constitutional error, in illegally admitting highly prejudicial evidence or comments, casts on someone other than the person prejudiced by it a burden to show that it was harmless.") Instead, Respondent contends there was no error in admitting Petitioner's confession at trial.

"A defendant's confession is probably the most probative evidence that can be admitted against him, so damaging that a jury should not be expected to ignore it even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 292 (1991). Additionally, "it is impossible to know what credit and weight the jury gave to the confession." *Id*.

Here, after being questioned in Spanish, Petitioner confessed <u>in Spanish</u> that she attempted to buy a baby to give her boyfriend a son. (Clerk's Transcript 7 at 1635-39.) Additionally, Petitioner stated she saw Velarde, her boyfriend and co-defendant, kill Ana by choking her:

Petitioner:    Y ya estaba desesperada porque [Velarde] queria un hijo.
(And I was desperate because [Velarde] wanted a son.)[4]

Pero (unintelligible) y yo no la queria matar. Y yo no la mate. Fue él.
(But (unintelligible), and I didn't want to kill her. I didn't kill her. He did.)

. . .

Det. Brawley: You saw him kill her?

Det. Ruiz:    Pero tu mirarste . . .
(But you saw . . .)

Petitioner:    [Nodding head, yes]

---

[4] Detective Ruiz translated Petitioner's answers for Detective Ruiz each time Petitioner answered questions in Spanish. For ease of reading, the Court has removed Detective Ruiz's translations.

|   |   | Yo lo mire. |
|---|---|---|
|   |   | (I saw.) |
|   | Det. Ruiz: | Cómo lo hizo? |
|   |   | (How did he do it?) |
|   | Petitioner: | La horco. |
|   |   | (He choked her.) |
|   |   | Y yo le dije que no la matara. |
|   |   | (And I told him not to kill her.) |
|   |   | Y ya fue todo lo que paso.  Y todo lo que les dije de todo si es cierto.  Y, y yo por eso iba a cuidar al niño. |
|   |   | (And that's all that happened.  And everything that I've told you is true.  And, and that's why I was taking care of the baby.) |
|   |   | Y el dijo que lo teniamos . . . lo teniamos que dejar ahi en esa casa . . . |
|   |   | (And [Velarde] told me that we had to . . . we had to leave [Anthony] there at that house . . .) |
|   |   | . . . y yo le dije que no, yo me lo queria quedar para cuidarlo. |
|   |   | (. . . and I told him no, that I wanted to keep him to take care of him.) |
|   |   | . . . ya que Ana estaba muerta. |
|   |   | (. . . now that Ana was dead.) |
|   |   | Me sentia bien culpable. |
|   |   | (I felt really guilty.) |
|   |   | Porque Ana se murió por el niño . . . |
|   |   | (Because Ana died for the baby . . .) |

*Id*. at 1640-41.

In Spanish, Petitioner admitted that she abandoned the baby, Anthony, on the doorstep of a house, because the lady "looked like a good person," and stated, "[I] said to myself, they're going to . . . get [Anthony] and then they are going to call the police right away, and they're going to give [Anthony] to them."  *Id*. at 1658.

Petitioner's involuntary statements to detectives were used during the prosecutor's closing argument.  The prosecutor argued:

The task left to you, ladies and gentlemen, is to decide what you believe.  Do you

believe the defendants planned, plotted and carried out this appalling crime together as we contend and believe the evidence overwhelmingly shows?  Or do you believe [Petitioner]'s contradictory, self-serving and cowardly story . . .?

Do you believe [Petitioner]'s uncorroborated stories of physical abuse and involuntary drug addiction?  Do you believe the story that she concocted for this trial that she was under the spell of her fiancé, a man she originally told detectives was a good man, who was good to her and her kids, that she had no idea what was happening just a few feet away from her as she sat on the bathroom floor with her ears covered while Ana de Ceja had the life choked right out of her?

One thing we're certain you know is that [Petitioner] is a practiced liar.  Not necessarily a good liar, but a woman who lies without hesitation whatsoever.  If one thing has distinguished this trial, it has been the mountain of lies [Petitioner] has told.

. . .

We know, again, Ana was enticed by [Petitioner] to the Market Street house to look at scarves.  We also know that [Petitioner] admitted to detectives that it was during the conversation on December 1st with Ana that she made up her mind to steal Anthony.  Here's what she said.

| | |
|---|---|
| [Det. Brawley]: | So when did you make up your mind you wanted Anthony? |
| [Petitioner]: | "day before." |
| . . . | |
| | "When – when I saw her with the baby.  Over here when I carried the baby." |
| [Det. Brawley]: | "You wanted it?" |
| [Petitioner]: | Nodding head "Yes." |
| [Det. Ruiz]: | "Just because [Velarde] wanted a son?" |
| [Petitioner]: | "And I couldn't. . . ." |
| . . . | |
| | "And I was desperate because [Velarde] wanted a son.  But I didn't want to kill her.  I didn't want to kill her.  He did." |

In those few responses ladies and gentlemen is the core of [Petitioner]'s undeniable guilt. [Petitioner]tried desperately on the witness stand to walk away from the admission but you know that effort failed. There's no translation error.

You will have the video. You'll have the transcript. No misunderstanding of what the defendants – or what the detectives were asking her. They asked point blank when she decided when she wanted Baby Anthony, and she answered point blank – the day before Ana was murdered, when she held Baby Anthony. Velarde wanted a son and she was desperate to give him one.

(Clerk's Transcript 20 at 4260-61, 4263-65.)

As demonstrated by the prosecutor's closing argument, Petitioner's involuntary statement to detectives was critical to the prosecution's case. As such, the undersigned cannot conclude "beyond a reasonable doubt" that the admission of Petitioner's involuntary statement "did not contribute to the verdict obtained." *Chapman*, 386 U.S. at 24. Therefore, the undersigned recommends that the Court grant Petitioner's request for relief based on her *Miranda* claim.

**3. The Trial Court Did Not Err in Denying Petitioner's Claim that Detectives Intimidated and Coerced her into Confessing**

In addition to arguing she did not knowingly and intelligently waive her *Miranda* rights, Petitioner contends she did not voluntarily waive her rights because she was intimidated and coerced into waiving them. (Doc. 21 at 38-41.) Specifically, Petitioner alleges "her voluntary use of methamphetamine in conjunction with law enforcement[s] manipulative use of language . . . in addition to their touching her shoulder and knee, when she had previously been subjected to abuse, leads to a finding her statement was involuntary." *Id*. at 38.

The test for coercion is, considering the totality of the circumstances, "'whether a defendant's will was overborne' by the circumstances surrounding the giving of a confession." *Dickerson v. United States*, 530 U.S. 428, 434 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)). Here, the state court found there was "no indication that the simple acts of touching [Petitioner's] knee or shoulder, which the detectives testified they had done only a couple of times during the interview as a means of positive reinforcement, were in any way aggressive, threatening,

or violent." *Ceja*, (F067979), at 20.

The undersigned agrees that Petitioner has shown she did not waive her *Miranda* rights knowingly and intelligently due to the language barrier, as she was not advised of her rights in Spanish. Therefore, regardless of whether the detectives coerced Petitioner by touching her shoulder or knee, the trial court erred in admitting Petitioner's statements to the detective.

## IV. The State Court Did Not Err in Allowing Two Investigating Officers to Remain in the Courtroom

In her second ground for habeas relief, Petitioner contends the trial court erred by allowing two investigating officers, who both testified at trial, to sit through the trial. (Doc. 1 at 12-13.) Respondent counters that the Court of Appeal's denial of Petitioner's claim was not contrary to, or an unreasonable application of, Supreme Court precedent. (Doc. 19 at 31.)

### A. State Court of Appeal Opinion

The Court of Appeal rejected Petitioner's claim that the trial court erred in permitting the prosecution to have two investigating officers sit through trial.

> Prior to the trial, the trial court granted a motion by the prosecution to designate two investigating officers, Detective Sanchez and Detective Ruiz. [Petitioner]'s counsel was not present. The prosecutor argued there were essentially two trials going on at the same time, that this was a very big case with "eight to nine files" and "120 police reports," and that the investigative work was essentially split between the two detectives. The trial court agreed and granted the motion as to Velarde.

> Several days later, with [Petitioner]'s counsel present, the prosecutor asked that the trial court's previous ruling be put on the record for [Petitioner]'s counsel. The trial court asked [Petitioner]'s counsel's position on the matter, but indicated it was inclined to rule the same as it had done in Velarde's case. When [Petitioner]'s counsel stated he had not heard Velarde's counsel's position, the trial court explained Velarde's counsel had objected to designating two investigating officers. [Petitioner]'s counsel responded, "I'll simply concur with those comments and submit it."

> The trial court then ruled as it had previously, stating it would:

>> "permit Detective Ruiz as being the assigned officer, investigating officer, for [Petitioner], and Detective Sanchez for [Velarde,] that there are unique aspects to this case noting that the Court has allowed in single jury cases for officers to switch out. I even had two in a one jury case. [¶] This case is peculiar because it has two juries, because of the volume of information,

33

documentation, which all counsel have concurred is enormous, and that each of them took a lead with a particular defendant and, therefore, are jury assigned for that defendant. And it makes sense for the Court to have that individual track the one defendant and be with that jury the entire time, noting even on opening statements we have [Velarde] on Thursday and [Petitioner] on Friday. So there are different things happening at different levels, and the Court finds it appropriate to allow the designation."

## *Applicable Law and Analysis*

[California] Evidence Code section 777, subdivision (a)[fn.6], permits the trial court to exclude witnesses from the courtroom, but subject to subdivisions (b) and (c) of that section. Subdivision (b) prohibits the trial court from excluding a "party to the action." Subdivision (c) provides, "If a person other than a natural person is a party to the action, an officer or employee designated by its attorney is entitled to be present." The word "person" includes a "public entity" (§ 175) such as the People of the State of California. Therefore, the prosecutor, the attorney for the People, could designate an officer or employee who was "'entitled to be present.'" (See *People v. Gonzalez* (2006) 38 Cal.4th 932, 950-951 [officer who interviewed witness during investigation of capital murder, as person designated by deputy district attorney, was entitled to be present in courtroom when witness testified at trial].)

fn.6    All further statutory references are to the [California] Evidence Code unless otherwise specified.

The refusal to exclude witnesses from the courtroom lies within the discretion of the court. (*People v. Willingham* (1969) 271 Cal.App.2d 562, 571.) As we said in *People v. Nunley* (1904) 142 Cal. 441, 445: "It cannot be held that the court abused its discretion in allowing the sheriff . . . who was a witness for the prosecution, to remain in the courtroom during the trial." And, as noted in *People v. Chapman* (1949) 93 Cal.App.2d 365, 373-374, "It is the common and usual practice that at least one peace official may remain during the presentation of evidence during the entire case." (See *People v. Gonzalez, supra*, 38 Cal.4th at pp. 950-951.)

[Petitioner] acknowledges this basic premise but argues that, in doing so, the trial court failed to consider the detriment to her "if two of the prosecution's key witnesses remained in the courtroom." [Petitioner], however, fails to support her allegation by any specific showing as to how she actually suffered detriment as a result of both investigating officers' presence. Instead, she merely speculates that the investigating officers "had the advantage of hearing the testimony of the other witnesses" and "the testimony of one of the officers could have easily jogged or skewed the other's memory of events."

[Petitioner]'s allegation of potential unfairness arising from the presence of two investigating officers is too speculative to establish error. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 378; *People v. Gonzalez, supra*, 38 Cal.4th at p. 951.) [Petitioner]'s defense remained free to bring to the trial court's attention any alleged misconduct that did materialize, and to seek appropriate relief. (*People v. Bryant, Smith and Wheeler, supra*, at p. 378.) Without a showing of detriment, it cannot be said that the trial court abused its discretion in permitting the two investigating officers, particularly considering the unique aspects of this case which lent itself to having two investigating officers instead of one.

[Petitioner] also argues the trial court violated her constitutional rights by deciding this issue adverse to her position "without the presence of . . . counsel." We disagree. While [Petitioner] is correct that the issue was first discussed in connection with co-defendant Velarde's case without [Petitioner] or [Petitioner]'s counsel present, [Petitioner] and Velarde had separate case numbers and dual juries. As noted by the trial court, the ruling in Velarde's case was not technically a ruling in [Petitioner]'s case. More importantly, before making the decision in [Petitioner]'s case, [Petitioner] was represented by counsel, who was given the opportunity for input before the ruling was made.

*Ceja*, (F067979), at 20-23.

### B. <u>Allowing Two Investigating Officers to Remain in the Courtroom Was Not Objectively Unreasonable</u>

Petitioner challenges the trial court's decision to allow the prosecution to have two investigating officers sit through the trial. Petitioner appears to challenge the application of the trial court's decision interpreting state law.

Absent fundamental unfairness, a petitioner's claim based solely on an alleged misapplication of state law is not cognizable on federal habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."). Consequently, the question before this Court is whether the trial court's allowing two investigating officers to remain in the courtroom "rendered the trial so fundamentally unfair as to violate due process." *Windham v. Merkle*, 163 F.3d 1092, 1103 (9th Cir. 1998).

Neither the Ninth Circuit "nor the Supreme Court has held that the failure to exclude witnesses can violate due process. Under common law, the decision to exclude witnesses was left to the discretion of the trial court." *Larson v. Palmateer*, 515 F.3d 1057, 1065 (9th Cir. 2008) (citing *Holder v. United States*, 150 U.S. 91, 92 (1893)).

Here, there is no evidence in the record to suggest that allowing two investigating officers to sit through the trial adversely affected the verdict. As the trial court noted, Petitioner "fails to

support her allegation by any specific showing as to how she actually suffered detriment as a result of both investigating officers' presence." *Ceja*, (F067979), at 22. Petitioner has not provided evidence that the trial court's decision resulted in a "fundamentally unfair" trial. Accordingly, the undersigned recommends denying Petitioner's second ground for habeas relief.

## V.    The State Court Did Not Err in Allowing Petitioner's Co-Defendant to Participate in the Trial

At trial, instead of severing Petitioner's case from Velarde's, the trial court impaneled two juries. Defense counsel for Velarde cross-examined Petitioner when she testified.

In Petitioner's third ground for habeas relief, she claims the trial court erred by allowing Velarde, to participate in her defense. (Doc. 1 at 14.) Specifically, Petitioner alleges Velarde was not a party to Petitioner's action "and had no right to cross-examine her or any witness in her jury's presence or present his defense in front of her jury." *Id*. at 14-15. Respondent counters that Petitioner has not shown the trial court's decision was unreasonable. (Doc. 17 at 38.)

### A.    State Court of Appeal Opinion

The Court of Appeal rejected Petitioner's contention that the trial court improperly allowed Velarde to participate in her defense.

> [Petitioner] makes numerous contentions relating to the trial court's decision to permit [Petitioner] and Velarde to participate in each other's defense cases-in-chief. Specifically, she argues (1) the trial court erred in allowing Velarde's counsel to cross-examine [Petitioner] and present evidence in front of her jury as Velarde had not standing to do so; (2) because Velarde had no statutory duty to disclose evidence to [Petitioner], he was not held to the same ethical standards as the prosecutor; (3) the trial court limited [Petitioner]'s ability to deal with Velarde's actions when it ruled she had limited standing to object; and (4) counsel for Velarde committed the equivalent of misconduct during his cross-examination of [Petitioner] during closing argument.

> *Background*

> We will address each of [Petitioner]'s contentions in turn, but first: "The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is 'powerfully incriminating' as to a second defendant when determining the latter's guilt, admission of such a confession at a

joint trial generally violates the confrontation rights of the nondeclarant." (*People v. Fletcher* (1996) 13 Cal.4th 451, 455.) Separate juries were used here because of the anticipated introduction of [Petitioner] and Velarde's out-of-court statements, each implicating the other, which could not be introduced in the presence of the jury for the nondeclarant codefendant, thus avoiding *Aranda-Bruton* error.

However, before Velarde's out-of-court statement was played for the jury, [Petitioner] waived her confrontation rights and consent[ed] to have her jury present when Velarde's out-of-court statements were introduced. In doing so, [Petitioner] was told that, if she waived the issue, she would have no right to cross-examine Velarde unless he took the stand. [Petitioner] said she understood. During the discussion on the waiver, the prosecutor stated he wanted [Petitioner] to know:

> "we sought to have these two trials together, two juries together, to protect her right to exactly what is being discussed here, the presence of her co-defendant's jury hearing statements that [Velarde] made that clearly discuss her participation in these crimes. And the whole purpose of doing this was to protect her rights.

When questioned again, [Petitioner] reiterated that she understood and again stated she wished to waive her rights. [Petitioner]'s counsel stated that there was a "strategic reason" for doing so. [Petitioner] does not now contest the validity of the waiver.

### Applicable Law and Analysis

#### 1. Participation in Each Other's Defense

After the close of the prosecution's case-in-chief to both juries, Velarde's counsel argued that, if [Petitioner]'s jury was not going to be excused for the presentation of Velarde's defense, he would object to [Petitioner]'s counsel asking any questions, noting [Petitioner] did not have standing and was not a "prosecutor against me." Counsel argued this issue had nothing to do with *Aranda-Bruton*, but that this was a trial being conducted concurrently by the People against two defendants and defended by each defendant individually. Counsel made the distinction between a joint trial and a dual trial and argued [Petitioner]'s counsel should not be able to present evidence during Velarde's defense, or vice versa.

The prosecutor argued that both juries should be present and [Petitioner]'s counsel should have the right to cross-examine the anticipated witnesses. According to the prosecutor, when Velarde put on his defense, "just like any case with multiple defendants," [Petitioner]'s jury would hear the evidence and should have the right to cross-examine those witnesses. In other words, both juries would be present and both defense counsel would be allowed to question the witnesses.

[Petitioner]'s counsel agreed with Velarde's counsel's argument, noting Velarde and [Petitioner] were each putting on a separate defense to what the People alleged. The trial court noted that, if there had been no *Aranda-Bruton* issue to begin with, "there would be two co-defendants on trial in front of one jury" and counsel for

each defendant would be allowed to cross-examine the other defendant's witnesses. So, as noted by the trial court, "[b]ut for *Aranda-Bruton*, we would not be having this discussion, and counsel would be actively engaged without question." The trial court then went off the record to research the issue.

Back on the record, the trial court cited two cases – *People v. Jackson* (1996) 13 Cal.4th 1164, 1207-1209 and *People v. Cummings* (1993) 4 Cal.4th 1233, 1287 – "for the proposition . . . whether a co-defendant in a dual jury trial has standing to participate specifically and cross examine witnesses in the co-defendant's case in chief." Not finding anything directly on point, the trial court nonetheless found its thinking was consistent with both cases, namely that:

> "But for the *Aranda-Bruton* issues, we would not have two juries. We'd have one jury, and this issue would be moot. Both counsel would participate and vigorously participate in the cross examination of the co-defendant's witnesses. [¶] . . . [I]t appears to the Court that our system is built on due process, and there's nothing more fundamental in due process than a defendant's right to confront and cross examine witnesses that appear and appear against them. The key here is opportunity. [¶] Now whether counsel have a tacit agreement or not to not participate, then the Court will note that that's their decision to make on a strategic basis not to participate. But it's . . . incumbent on the Court to assure that the fundamental right, which is the opportunity to confront and cross examine such witnesses, be had. [¶] . . . [G]uiding the Court, based on those principles and based on the limited information, the Court is going to permit both defendants and their juries to sit through the presentation of the case in chief of the other co-defendant. [¶] The court would note the only thing that's really constricting it are the [*Aranda-Bruton*] issues . . . . In one case, [Petitioner] waived, and [Velarde] has not. And, therefore, we excused [Velarde's] jury for the last day and a half, those portions dealing specifically with the interview and the interrogation where [Velarde] would not be afforded a right of cross-examination, not knowing whether [Petitioner] would take the stand was cured by the excusing of the [Velarde] jury."

The trial court then held that [Petitioner] had standing to participate in Velarde's case in chief, and Velarde had standing to participate in [Petitioner]'s. "It's in both defendants' strategy to decide how much, if any, they're going to participate in the cross examination of the other defendant's witnesses in their case in chief." Finally, the trial court noted that it was "not lost on the Court that [Petitioner] has waived the *Aranda-Bruton*. And if [Velarde] for some reason takes the stand and I have excused the [Petitioner's] jury, there's no way of undoing it."

[Petitioner] first contends it was structural error to permit Velarde to participate in her trial, particularly to allow Velarde's counsel to cross-examine her and present a defense in front of the jury. However, [Petitioner] has misinterpreted the dual jury procedure employed by the trial court because [Petitioner] and Velarde were not granted separate trials, they were granted separate juries.

Had [Petitioner] and Velarde been tried separately, [Petitioner] would not have been subject to cross-examination by Velarde nor would Velarde have been allowed to present evidence. But [Petitioner] was not tried alone and had no right to a separate trial. (See *People v. Wallace* (1970) 13 Cal.App.3d 608, 619; *People v. Baa* (1944) 24 Cal.2d 374, 377.) As explained above, Velarde's jury was excluded for the portions of the trial that involved [Petitioner]'s out-of-court statements implicating *Aranda-Bruton* and were not cross-admissible. But other than when

that evidence was introduced, the trial court proceeded similarly to as if it had been a joint trial with only one jury, i.e., the prosecution's witnesses were cross-examined by counsel for [Petitioner] and Velarde, and [Petitioner] and Velarde each participated fully in the other's defense case-in-chief, just as they would have had it been a joint trial with one jury.

We reject [Petitioner]'s claim that she was prejudiced by this procedure. In rejecting a similar claim, the court in *People v. Jackson*, *supra*, 13 Cal.4th 1164, noted the defendant failed to identify any evidence brought out on cross-examination "that would have been inadmissible at a separate trial. The mere fact that a damaging cross-examination that the prosecution could have undertaken was performed instead by a codefendant's counsel did not compromise any of defendant's constitutional or statutory rights." (*Id.* at p. 1208; *see People v. Cummings*, *supra*, 4 Cal.4th at p. 1286, fn. 25.) Here, too, the fact that any damaging testimony to [Petitioner] was elicited during Velarde's defense case, rather th[a]n during the prosecution's case-in-chief, did not compromise any of [Petitioner]'s constitutional or statutory rights.

Similarly, the fact that Velarde's defense may have been antagonistic towards [Petitioner] did not require the exclusion of [Petitioner]'s jury. "That defendants have inconsistent defenses and may attempt to shift responsibility to each other does not compel severance of their trials [ ], let alone establish abuse of discretion in impaneling separate juries." (*People v. Cummings*, *supra*, 4 Cal.4th at p. 1287; accord *People v. Boyde* (1988) 46 Cal.3d 212, 232-233, overruled on another point in *People v. Johnson* (2016) 62 Cal.4th 600, 648.)

### 2. Velarde's Counsel's Duty to Disclose Evidence or to be held to a Heightened Ethical Standard

[Petitioner] also contends Velarde's counsel was not subject to the same statutory discovery requirements as the prosecutor or "held to a prosecutor's heightened ethical standard." However, this was no different than any joint trial with one jury, and we reject her claim to the contrary.

### 3. Limiting [Petitioner]'s Standing to Object

[Petitioner] next claims the trial court violated her right to due process by limiting her "to hearsay objections throughout much of Velarde's examination of witnesses." To support her claim, [Petitioner] points to two instances.

In the first, during Hembree's testimony, Hembree was asked by Velarde's counsel what [Petitioner] had done to convince Hembree she was pregnant. [Petitioner]'s counsel objected, stating the question was beyond the scope of direct examination. The trial court initially sustained the objection, the but the prosecutor argued that it was the prosecution's scope, not [Petitioner]'s, and a sidebar was conducted.

The trial court memorialized what occurred during the sidebar for the record and explained that the prosecutor argued he alone had standing to object to exceeding the scope in this instance and [Petitioner] was limited to a hearsay objection. The prosecutor further stated he was not objection, but would request to re-open and delve into the issue, mooting the beyond-the-scope objection if granted. The trial court explained it wished "to note the standing issue" and would permit Velarde's counsel to proceed with the questioning "contingent on the prosecution delving into the issue, as well, which they've indicated they will."

In the second instance, [Petitioner]'s counsel similarly objected when Velarde's counsel asked Hembree whether [Petitioner] "[h]ad a reputation that [she] knew of showing her breasts to the male correctional officers there." A similar sidebar and ruling ensued.

Based on these two instances, [Petitioner] claims she did not "have available the full range of trial objections to protect her right [to] a trial based on reliable evidence" and that she was improperly limited "to hearsay objections throughout much of Velarde's examination of witnesses."

We do not find the record supports [Petitioner]'s claim. In the two instances mentioned, the trial court did not hold [Petitioner] lacked standing to raise her objection. Instead, both objections involved questions regarding areas of inquiry the prosecution wished to delve into and this was a prosecution witness. Had the trial court granted [Petitioner]'s beyond-the-scope objection, it would likely have granted the prosecution's request to re-open and delve into those areas if Velarde's counsel did not.

The trial court has discretion "to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." ([Cal.] Pen. Code, § 1044; see also [Cal.] Evid. Code, §§ 765, subd. (a) ["court shall exercise reasonable control over the mode of interrogation of a witness so as to make interrogation as rapid, as distinct, and as effective for the ascertainment of truth"] and 744 [court has discretion to allow counsel to re-open examination of witness].)

We find no error on the part of the trial court.

### 4. Misconduct of Velarde's Counsel

Finally, relying on *People v. Estrada* (1998) 63 Cal.App.4th 1090 (*Estrada*), [Petitioner] contends Velarde's counsel committed the equivalent of misconduct during his cross-examination of her and during closing argument. We find no merit to [Petitioner]'s claim.

As [Petitioner] points out, the court in *Estrada* applied the principles of prosecutorial misconduct to a claim of misconduct by a codefendant's counsel. (*Estrada*, *supra*, 63 Cal.App.4th at pp. 1095-1096.) However, if those principles are applied here, [Petitioner]'s claim has been forfeited by her counsel's failure to object to the many questions and statements by Velarde's counsel she now claims are objectionable. (See *People v. Crew* (2003) 31 Cal.4th 822, 839 ["[A] claim of prosecutorial misconduct is not preserved for appeal if defendant fails to object and seek an admonition if an objection and jury admonition would have cured the injury. [ ]"].)

Even addressing the issue on the merits, we find [Petitioner]'s claim lacks merit. "'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.' [ ] Under California law, a prosecutor who uses deceptive or reprehensible methods of persuasion commits misconduct to determine whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. (*People v. Friend* (2009) 47 Cal.4th 1, 29.)

[Petitioner] first claims Velarde's counsel engaged in a pattern of conduct designed

40

to appeal to the passion and prejudice of the jury and to "portray [Petitioner] as badly as possible." As evidence of this, [Petitioner] points to Velarde's counsel['s] use of the term "home invasion robbery" when describing [Petitioner]'s and Hembree's actions at [Petitioner]'s mother-in-law's. While the term "robbery" was used instead of "burglary" to describe the event, Velarde's counsel did not misrepresent the facts testified to surrounding that event. In addition, [Petitioner] herself referred to the crime as a "robbery" instead of a "burglary" during her testimony.

[Petitioner] also complains Velarde's counsel's questioning of her concerning her pregnancy, whether she had had an abortion, whether she had chlamydia, and whether she had lied to her son's father about his paternity in order to get him to support her were improper questions, especially as some constituted questions used solely for the purpose of getting before the4 jury facts inferred herein. All of these questions were, however, within the proper scope of cross-examination as they concerned [Petitioner]'s credibility and particularly whether she had faked a pregnancy in order to carry out the kidnapping.

[Petitioner] next contends Velarde's counsel improperly asked questions aimed at having her evaluate the credibility of other witnesses by asking her several times if other witnesses were lying when they testified. But again, those questions concerned [Petitioner]'s credibility, as Velarde's counsel was confronting her with the inconsistencies of her own testimony and the inconsistencies between her statements and those of other witnesses. (See *People v. Letner and Tobin* (2010) 50 Cal.4th 99, 199 [in general, permissible scope of cross-examination is very broad]; *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1139 [by taking the stand, defendant put his own credibility in issue].)

[Petitioner] also claims Velarde's counsel "[m]ocked" (boldface omitted) her by using the terms "idiots." Velarde's counsel, however, was repeating the term [Petitioner] had used when she described herself and two others as "the idiots who went and committed the robbery" in response to the previous question asked by Velarde's counsel.

[Petitioner] next claims Velarde's counsel improperly "suggested facts not in evidence" (boldface and capitalization omitted) by asking one witness if he knew kidnapping was primarily a crime committed by women. And in the subsequent line of questioning in which Velarde's counsel confronted [Petitioner] with Velarde's theory that she, not Velarde, had masterminded both the burglary and the murder and kidnapping plot, and that she, not Velarde, had actually strangled Ana. But again, these questions were within the permissible scope of cross-examination and did not rise to the level of misconduct. (See *People v. Letner and Tobin*, *supra*, 50 Cal.4th at p. 199; see also *People v. Gutierrez*, *supra*, 28 Cal.4th at p. 1139.)

In any event, even if we find some of the complained of conduct to be misconduct, given the vast inconsistencies and implausible nature of [Petitioner]'s own testimony, there is no reasonable probability the jury would have found [Petitioner]'s testimony credible even if they had not heard the complained of questioning by Velarde's counsel. This is not a case where Velarde's counsel's "acts of misconduct, inadequately checked by the trial court, were so egregious they infected the trial with such unfairness they denied appellant due process." (*Estrada*, *supra*, 63 Cal.App.4th at pp. 1106-1107.) We reject [Petitioner]'s claim to the contrary.

*Ceja*, (F067979), at 30-38.

**B. Denial of Petitioner's Claim that her Co-Defendant Improperly Participated in the Case Was Not Objectively Unreasonable**

Petitioner and Velarde were tried with dual juries. Consequently, two juries were impaneled and heard all of the prosecution's evidence at the same time. Velarde's jury was excluded when Petitioner's post-arrest statements implicating Velarde were presented to the jury. However, Petitioner's jury was not excluded when Velarde's post-arrest statements were presented to his jury, because she waived her right to confrontation and allowed Velarde's statements to be played with her jury present.

Petitioner maintains the trial court improperly allowed her co-defendant, Velarde, to participate in her trial by allowing his defense attorney to cross-examine Petitioner. To the extent Petitioner is challenging the trial court's decision to proceed with a dual jury, her claim fails. Petitioner cannot point to any clearly established federal law governing this claim, and the Supreme Court has not spoken on the issue of dual juries.

In *Zafiro v. United States*, the Supreme Court held that severance is not required even in the face of antagonistic defenses. 506 U.S. 534, 538-39 (1993). The Court stated that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. at 539. However, *Zafiro* was a direct appeal that originated in federal district court and does not apply on § 2254 review. *See Collins v. Runnels*, 603 F.3d 1127, 1131-32 (9th Cir. 2010) ("By its own wording, *Zafiro* only applies to federal and not state court trials. It analyzes only the Federal Rules of Criminal Procedural applicable to federal district courts.").

Even if the Court were to apply *Zafiro*'s prejudice holding, Petitioner states her Due Process rights and Confrontation Rights were violated, but does not provide further arguments with citation to any authority.

Petitioner also contends Velarde's counsel "attacked Petitioner with a vengeance." (Doc.

42

21 at 66.) Petitioner argues Velarde's counsel effectively acted as a second prosecutor. Petitioner specifically objects to the trial court's limitation on her counsel's objections and Velarde's counsel's cross-examination of Petitioner.

The state court reasonably found that the record does not support Petitioner's claim that the trial court limited her ability to object and Velarde's counsel did not commit misconduct during his cross-examination of Petitioner.

"[I]t is not the province of the federal habeas court to reexamine state court determinations on state-law questions." *Estelle*, 502 U.S. at 68. Generally, federal courts may not review a trial court's evidentiary rulings. *Crane v. Kentucky*, 476 U.S. (1986) ("We acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."). Therefore, a state court's evidentiary ruling, even if erroneous, is grounds for federal habeas relief only if it is so fundamentally unfair as to violate due process. *Dillard v. Roe*, 244 F.3d 758, 766 (9th Cir. 2001).

As explained in the Court of Appeal's opinion, Petitioner cites to two examples of the trial court limiting her counsel's ability to object during Veldarde's counsel's examination of witnesses.[5]

---

[5] The Court of Appeal described the two instances as follows:

> In the first, during Hembree's testimony, Hembree was asked by Velarde's counsel what [Petitioner] had done to convince Hembree she was pregnant. [Petitioner]'s counsel objected, stating the question was beyond the scope of direct examination. The trial court initially sustained the objection, the but the prosecutor argued that it was the prosecution's scope, not [Petitioner]'s, and a sidebar was conducted.

> The trial court memorialized what occurred during the sidebar for the record and explained that the prosecutor argued he alone had standing to object to exceeding the scope in this instance and [Petitioner] was limited to a hearsay objection. The prosecutor further stated he was not objection, but would request to re-open and delve into the issue, mooting the beyond-the-scope objection if granted. The trial court explained it wished "to note the standing issue" and would permit Velarde's counsel to proceed with the questioning "contingent on the prosecution delving into the issue, as well, which they've indicated they will."

> In the second instance, [Petitioner]'s counsel similarly objected when Velarde's counsel asked Hembree whether [Petitioner] "[h]ad a reputation that [she] knew of showing her breasts to the male correctional officers there." A similar sidebar and ruling ensued.

43

However, as the Court of Appeal noted, the trial court did not limit counsel's right to object universally, but found both of the specific "objections involved questions regarding areas of inquiry the prosecution wished to delve into; therefore, "[h]ad the trial court granted [Petitioner]'s beyond-the-scope objection, it would likely have granted the prosecution's request to re-open and delve into those areas if Velarde's counsel did not." *Ceja*, (F067979), at 35. It is not clear from Petitioner's two examples that the trial court's rulings were improper or harmed Petitioner in any way. Therefore, habeas relief is not proper.

Petitioner next maintains Velarde's counsel committed misconduct during Petitioner's cross-examination and during closing argument. As the Court of Appeal noted, however, Petitioner's counsel did not object to counsel's conduct during cross-examination and closing argument. *Id.* at 36. The Court of Appeal found Petitioner "forfeited" the claim by her counsel's failure to object; in other words, Petitioner procedurally defaulted on this claim. *Id*

A federal court cannot review claims in a petition for writ of habeas corpus if a state court denied relief on the claims based on state law procedural grounds that are independent of federal law and adequate to support the judgment. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991). "A district court properly refuses to reach the merits of a habeas petition if the petitioner has defaulted on the particular state's procedural requirements." *Park v. California*, 202 F.3d 1146, 1150 (2000).

A petitioner procedurally defaults her claim if she fails to comply with a state procedural rule or fails to raise her claim at the state level. *Peterson v. Lampert*, 319 F.3d 1153, 1156 (9th Cir. 2003) (citing *O'Sullivan v. Boerckel*, 562 U.S. 838, 844-45 (1999)). The procedural default doctrine applies when a state court's determination of default is based in state law that is both

---

*Ceja*, (F067979), at 34-35.

44

adequate to support he judgment and independent of federal law. *Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991). An adequate rule is one that is "firmly established and regularly followed." *Id.* (quoting *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)); *Bennett v. Mueller*, 322 F.3d 573, 583 (9th Cir. 2003). An independent rule is one that is not "interwoven with federal law." *Park*, 202 F.3d 1146 at 1152 (quoting *Michigan v. Long*, 463 U.S. 1032, 1040-41 (1983)).

When a state prisoner has defaulted on her federal claim in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred, unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

California law has long required a defendant to make a timely and specific objection at trial to preserve a claim for appellate review. *See*, *e.g.*, Cal. Evid. Code § 353; *People v. Ramos*, 15 Cal.4th 1133, 1171 (1997); *People v. Green*, 27 Cal.3d 1, 27 (1990). The United States Supreme Court has acknowledged that a state court's application of a contemporaneous objection rule may constitute grounds for default. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Further, the Ninth Circuit has confirmed that the contemporaneous default rule is independent. *Vansickel v. White*, 166 F.3d 953, 957-58 (9th Cir. 1999); *Bonin v. Calderon*, 59 F.3d 815, 842-43 (9th Cir. 1995); *Hines v. Enomoto*, 658 F.2d 667, 673 (9th Cir. 1981).

Here, the Court of Appeal invoked the procedural bar in rejecting Petitioner's claim.[6] Therefore, this Court is barred from considering the issue, unless Petitioner can demonstrate both "cause" for his failure to raise the objection at trial and "prejudice" from the error. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Petitioner does not address the procedural default; consequently,

---

[6] The fact that the Court of Appeal also addressed the claim on the merits does not affect the procedural bar. *Harris v. Reed*, 489 U.S. 255, 263 (1989).

the Court recommends denying Petitioner's claim.

## VI.     A Jury Instruction Error Does Not Present a Cognizable Federal Claim

In her fourth ground for habeas relief, Petitioner challenges several jury instructions.  (Doc. 1 at 17-24.)   Specifically, Petitioner alleges (1) the murder and kidnapping instructions were confusing; (2) the jury was incorrectly instructed on the element of asportation; and (3) an uncharged coconspirator charge violated her constitutional rights.

### A.  Standard of Review

Generally, claims of instructional error are questions of state law and are not cognizable on federal habeas review.  "[T]he fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle*, 502 U.S. at 71-72 (1991) (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of state evidentiary rules")).  A petitioner may not "transform a state-law issue into a federal one merely by asserting a violation of due process."  *Langford*, 110 F.3d at 1389 (citing *Melugin v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).

To prevail on a collateral attack of state court jury instructions, a petitioner must do more that prove that the instruction was erroneous.  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  Instead, the petitioner must prove that the improper instruction "by itself so infected the entire trial that the resulting conviction violated due process."  *Estelle*, 502 U.S. at 72 (internal citations omitted).   Even if there were constitutional error, habeas relief cannot be granted absent a "substantial and injurious effect" on the verdict.  *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776).

A federal court's review of a claim of instructional error is highly deferential.  *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993).   A reviewing court may not judge the instruction in isolation but must consider the context of the entire record and of the instructions

as a whole. *Id.* The mere possibility of a different verdict is too speculative to support a finding of constitutional error. *Henderson*, 431 U.S. at 157. "Where the jury verdict is complete, but based upon ambiguous instructions, the federal court, in a habeas petition, will not disturb the verdict unless there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution." *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000) (quoting *Estelle*, 502 U.S. at 72) (internal quotation marks omitted).

If a trial court has made an error in an instruction, a habeas petitioner is only entitled to relief if the error "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (quoting *Kotteakos*, 328 U.S. at 776) (internal quotation marks omitted). A state prisoner is not entitled to federal habeas relief unless the instructional error resulted in "actual prejudice." *Id.* A violation of due process occurs only when the instructional error results in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett v. Godinez*, 67 F.3d 734, 746 (9th Cir. 1995). If the court is convinced that the error did not influence the jury, or had little effect, the judgment should stand. *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

**B. Murder and Kidnapping Instruction**

Petitioner was convicted of first-degree murder, (Cal. Penal Code § 187), with the special circumstance of lying in wait, (Cal. Penal Code § 190.2(a)(15)), and murder in the commission of a kidnapping, (Cal. Penal Code § 207(a)).

Petitioner argues the murder and kidnapping jury instructions, "when read together were confusing and improper, permitted the jury to convict [Petitioner] on an improper theory and lowered the prosecution's burden of proof." (Doc. 21 at 86-87.)

The jury was instructed on CALCRIM No. 416, which instructs on evidence of an uncharged conspiracy:

The People have presented evidence of a conspiracy. A member of a conspiracy is criminally responsible for the acts or statements of any other member of the

47

conspiracy done to help accomplish the goal of the conspiracy.

To prove that the defendant was a member of a conspiracy in this case, the People must prove that:

1. The defendant intended to agree and did agree to commit Murder, Kidnapping, and later Child Endangerment;

2. At the time of the agreement, the defendant and the other alleged member of the conspiracy intended that one or more of them would commit Murder, Kidnapping, and later Child Endangerment;

3. The defendant committed at least one of the following overt acts to accomplish Murder, Kidnapping, and Child Endangerment: (a) Invited Victim to defendant's house, (b) Call Defendant Velarde when Victim arrived at their home, (c) Kept Victim occupied and retained her presence while Defendant Velarde traveled from work back home, (d) Held baby while Defendant Velarde strangled Victim, (e) Aided in the disposal of the Victim[']s car, (f) Aided in the disposal of the Victim's body, (g) Abandoned and burned Crown Victoria used to transport Victim's body, (h) Purchased baby paraphernalia at WalMart, (i) Proclaimed to family and friends baby was their newborn son, (j) Reported Crown Victoria stolen to law enforcement, (k) Submitted claim to AAA for loss of Crown Victoria; and (l) abandoned the infant on the door steps of another in the early morning on a cold, December day without warning or notice.

AND

4. At least one of these overt acts was committed in California.

To decide whether the defendant committed these overt acts, consider all of the evidence presented about the acts.

To decide whether the defendant and the other alleged member of the conspiracy intended to commit Murder, Kidnapping, and later Child Endangerment, please refer to the separate instructions that I will give you on one or more of those crimes. The People must prove that the members of the alleged conspiracy had an agreement and intent to commit Murder, Kidnapping, and later Child Endangerment. The People do not have to prove that any of the members of the alleged conspiracy actually met or came to a detailed or formal agreement to commit one or more of those crimes. An agreement may be inferred from conduct if you conclude that members of the alleged conspiracy acted with a common purpose to commit the crime.

An *overt act* is an act by one or more of the members of the conspiracy that is done to help accomplish the agreed upon crime. The overt act must happen after the defendant has agreed to commit the crime. The overt act must be more than the act of agreeing or planning to commit the crime, but it does not have to be a criminal

48

act itself.

You must all agree that at least one overt act was committed in California by at least one alleged member of the conspiracy, but you do not have to all agree on which specific overt act or acts were committed or who committed the overt act or acts.

The People contend that the defendant conspired to commit the following crimes: Murder, Kidnapping, and later Child Endangerment. You may not find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agreed which crime she conspired to commit. You must also all agree on the degree of the crime.

A member of a conspiracy does not have to personally know the identity or roles of all the other members.

Someone who merely accompanies or associates with members of a conspiracy but who does not intend to commit the crime is not a member of the conspiracy.

(Clerk's Transcript 8 at 1749-51.)

The jury was also instructed on the liability for a coconspirators' acts, pursuant to CALCRIM No. 417:

A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime.

A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy. This rule applies even if the act was not intended as part of the original plan. Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence.

A member of a conspiracy is not criminally responsible for the act of another member if that act does not further the common plan or is not a natural and probable consequence of the common plan.

To prove that the defendant is guilty of the crimes . . ., the People must prove that:

1. The defendant conspired to commit one of the following crimes: Murder, Kidnapping, and Child Endangerment;

49

2. A member of the conspiracy committed the crimes of Murder, Kidnapping, and Child Endangerment;

AND

3. The killing of Ana [ ], the taking and later abandonment of Ana['s] [ ] infant son, Anthony was a natural and probable consequence[ ] of the common plan or design of the crime that the defendant conspired to commit.

*Id*. at 752-53.

Petitioner contends these instructions were deficient because the prosecutor failed to tell the jury which crimes were the target offenses and which crimes occurred as the natural and probable consequence of each target offense.

### 1. **State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's contention that the trial court incorrectly instructed the jury on murder and kidnapping, finding there was no prejudicial error.

In considering a claim of instructional error, we must first ascertain what the relevant law provides, and then determine what meaning the instructions given convey. (*People v. Andrade* (2000) 85 Cal.App.4th 579, 585.) "The test is whether there is a reasonable likelihood that the jury understood the instruction in a manner that violated the defendant's rights. In making this determination, we consider the specific language under challenge and, if necessary, the instructions as a whole. [ ]" (*Ibid*.) "'"[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'" [ ]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.)

*Applicable Law and Analysis*

[Petitioner] was convicted as charged with first-degree murder (Pen. Code, § 187, subd. (a)), with the special circumstances of lying in wait (Pen. Code, § 190.2, subd. (a)(15)) and murder in the commission of a kidnapping (Pen. Code, § 190.2, subd. (a)(17)(B)); kidnapping (Pen. Code, § 207, subd. (b)); child endangerment (Pen. Code § 273a, subd. (a)); and with solicitation to commit kidnapping (Pen. Code, § 653f, subd. (a)).

[Petitioner] argues "problems arose" when the jury was instructed on an uncharged conspiracy and the natural and probable consequence doctrine. Instruction on the uncharged conspiracy theory (CALCRIM No. 416) was given, in pertinent part, as follows:

"To prove that the defendant was a member of a conspiracy in this case, the People must prove that: One, the defendant intended to agree and did agree to commit murder, kidnapping, and later child endangerment . . . . [¶] . . .

50

> [¶]  The People contend that the defendant conspired to commit the following crime[s]: murder, kidnapping, and later child endangerment.  You may not find the defendant guilty under a conspiracy theory unless all of you agree that the People have proved that the defendant conspired to commit at least one of these crimes, and you all agree which crime she conspired to commit.  You must also agree on the degree of the crime."

The jury was further instructed on the liability of a co-conspirator's acts, in pertinent part, as follows:

> "A member of a conspiracy is criminally responsible for the crimes that he or she conspires to commit, no matter which member of the conspiracy commits the crime.  [¶] . . . [¶]  A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy . . . .  [¶]  A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. . . .  [¶] . . . [¶]  To prove that the defendant is guilty of the crimes charged in Counts One, Two and Three, the People must prove that: One, the defendant conspired to commit one of the following crimes: murder, kidnapping, and child endangerment; two, a member of the conspiracy committed the crimes of murder, kidnapping and child endangerment; and three, the killing of [Ana], the taking and later abandonment of Ana['s] . . . son, Anthony, was a natural and probable consequence of the common plan or design of the crime that the defendant conspired to commit."

[Petitioner] argues these instructions were deficient because, when the jury was instructed on the uncharged conspiracy and the natural and probable consequence doctrine, the prosecution failed to delineate which crimes were the target offenses and which crimes occurred as the natural and probable consequence of each target offense.  [Petitioner] argues the jury was instructed that "all charged crimes were natural and probable consequence of the unnamed crime [Petitioner] planned to commit when there was no evidence to support this theory . . . ."  As a result, [Petitioner] contends the instructions permitted the jury to find her "guilty of a conspiracy to commit murder and kidnap[ping] based on the later uncharged conspiracy to abandon the baby that supported [the] child endangerment offense."  She further claims kidnapping could not have been a natural and probable consequence of a conspiracy to commit murder and that the child endangerment offense could not have been a natural and probable consequence of the originally contemplated kidnapping and murder.

However, as acknowledged by [Petitioner] the jury found true the special circumstance allegations that [Petitioner] intentionally killed Ana [b]y means of lying in wait and that she committed the murder while engaged in the commission or attempted commission of the crime of kidnapping.  In order to find the lying in wait special circumstance true, the jury was instructed the prosecution had to prove [Petitioner] was an accomplice or part of a conspiracy to intentionally kill Ana, and that she aided and abetted in the commission of the murder by means of lying in wait.

And, in order to find the kidnapping special circumstance true, the jury was instructed the prosecution had to prove [Petitioner] was a member of the conspiracy to commit kidnapping; that if she did not personally commit kidnapping, then another perpetrator, with whom [Petitioner] conspired, personally committed

kidnapping; that Velarde did an act that was a substantial factor in causing the death of another person; that [Petitioner] intended that the other person be killed; that the act causing the death and kidnapping were part of a continuous transaction; and that there was a logical connection between the act causing death and the kidnapping.

Thus, even assuming that the instruction on the natural and probable consequence doctrine was deficient for failing "to delineate which crimes were the target offenses and which crimes occurred as the natural and probable consequence of each target offense," such error was harmless under any standard as to the murder and kidnapping counts. By finding the two special circumstance allegations true, the jury necessarily found true beyond a reasonable doubt that [Petitioner] was an accomplice or part of a conspiracy to intentionally kill Ana; that she aided and abetted in the commission of the murder by means of lying in wait; that she was also a member of a conspiracy to commit kidnapping; that she intended the kidnapping and murder be committed; and that there was a logical connection between the act causing death and the kidnapping and that the acts were part of one continuous transaction. Based on the jury's true findings on the two special circumstances, it is clear that the jury did not rely on the natural and probable consequence doctrine at all in finding [Petitioner] guilty of the murder and kidnapping.
. . .

We find the complained of error harmless even under *Chapman*, *supra*, 386 U.S. at p. 24, the more stringent of the two standards which normally apply to instructional error. (*People v. Salas* (2006) 37 Cal.4th 967, 984.) Under *Chapman*, the court must reverse the conviction unless it is convinced beyond a reasonable doubt that the error was harmless, i.e., that it did not contribute to the conviction. There is no reasonable possibility [Petitioner] was convicted based on the improper legal theory [Petitioner] contends and we reject her claim to the contrary.

*Ceja*, (F067979), at 38-42.

## 2. The Court Did Not Err in Instructing the Jury on Murder and Kidnapping

As the Court of Appeal noted, Petitioner argued the instructions on an uncharged conspiracy and natural and probable consequences were deficient, so that the jury was permitted to find Petitioner "guilty of a conspiracy to commit murder and kidnap[ping] based on the later uncharged conspiracy to abandon the baby that supported [the] child endangerment offense." *Id*. at 40.

For the Court to grant habeas relief based upon an error in a jury instruction, there must be a "reasonable likelihood" the jury applied the instruction in a way that violated the Constitution. *Solis*, 219 F.3d at 927 (quoting *Estelle*, 502 U.S. at 72). As the Court of Appeal noted, the instruction may not be construed in isolation, but rather, in the context of all the other jury instructions and the trial record as a whole. *Estelle*, 502 U.S. at 72.

Even assuming there was an error in these instructions, the jury's true finding on the special circumstance rendered any error harmless. In finding Petitioner intentionally killed Ana by means of lying in wait and committed the murder while engaged in the commission or attempted commission of kidnapping, the jury necessarily had to find true "that Petitioner was an accomplice or part of a conspiracy to intentionally kill Ana; that she was also a member of a conspiracy to commit kidnapping; that she intended the kidnapping and murder be committed; and that there was a logical connection between the act causing death and the kidnapping and that the acts were part of one continuous transaction." *Id*. at 41. Based on these findings, the jury did not need to find Petitioner guilty of murder and kidnapping through the natural and probable consequences doctrine.

Considering the jury instructions as a whole, Petitioner has not shown that these instructions resulted in the trial being fundamentally unfair. *Estelle*, 502 U.S. at 72-73; *Duckett*, 67 F.3d at 746. Therefore, the undersigned recommends denying Petitioner's claim.

## C. <u>Asportation Instruction</u>

Next, Petitioner alleges the jury instructions on asportation were confusing and incomplete; therefore, her conviction for kidnapping and the special circumstance of murder in the commission of kidnapping should be reversed. (Doc. 1 at 20.)

The jury was given two instructions with regard to the kidnapping charges. As read to the jury, CALCRIM No. 1215 states:

> The defendant is charged . . . with kidnapping in violation of Penal Code section 207(a).
>
> To prove that the defendant is guilty of this crime, the People must prove that:
>
> 1. The defendant took, held or detained another person by using force or by instilling reasonable fear;
>
> 2. Using that force or fear, the defendant moved the other person a substantial distance;
>
> AND

3. The other person did not consent to the movement.

*Substantial distance* means more than a slight or trivial distance. In deciding whether the distance was substantial, you must consider all the circumstances relating to the movement.

(Clerk's Transcript 8 at 1767.

Further, the jury was instructed pursuant to CALCRIM No. 1201, which as read to the jury stated:

The defendant is charged . . . with the further allegation that the person kidnapped was under the age of 14 years old in violation of Penal Code Section 207.

To find this allegation true, the People must prove:

1. The defendant used physical force to take and carry away an unresisting child;

2. The defendant moved the unresisting child a substantial distance;

3. The defendant moved the child with an illegal intent or for an illegal purpose;

AND

4. The child was under 14 years old at the time of the movement.

*Substantial distance* means more than a slight or trivial distance. In deciding whether the distance was substantial, consider all the circumstances relating to the movement.

A person is incapable of giving legal consent if he or she is unable to understand the act, its nature, and possible consequences.

*Id*. at 1768.

Both of these instructions omitted a bracketed phrase included in the "substantial distance" definition from the pattern California Criminal Jury Instructions:

[Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the movement increased the risk of [physical or psychological] harm, increased the danger of a foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection.]

54

CALCRIM Nos. 1201 & 1215.

Petitioner alleges the omission of this bracketed phrase gave the jury no guidance on how to evaluate the asportations. (Doc. 20 at 101.)

## 1. **State Court of Appeal Opinion**

The Court of Appeal rejected Petitioner's claim that her conviction for kidnapping and the special circumstance should be reversed:

> [Petitioner] was convicted of kidnapping (Pen. Code, § 207, subd. (a)) and subjected to an increased sentence because the jury found true the person kidnapped was under 14 years of age (Pen. Code, § 208, subd. (b)). In addition, the jury found true the allegation that Ana's murder was committed while [Petitioner] was engaged in the commission of the crime of kidnapping (Pen. Code, § 190.2, subd. (a)(17)(B)).

> To prove the crime of kidnapping, the prosecution must establish three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement was without the person's consent; and (3) the movement of the person was for a substantial distance. (Pen. Code, §207, subd. (a); *People v. Jones* (2003) 108 Cal.App.4th 455, 462.)

> [Petitioner] acknowledges the jury was instructed with CALCRIM No. 1215 (kidnapping) and CALCRIM No. 1201 (kidnapping of child or person incapable of consent), both of which instructed the jury that [Petitioner] must have moved the victim for a substantial distance, meaning more than slight or trivial, and that in making that determination, it must consider all the circumstances relating to the movement. But she claims the trial court prejudicially erred when it omitted the following bracketed phrase in each instruction that further defined what the jury could consider in deciding whether the asportation element of kidnapping had been met:

>> "[Thus, in addition to considering the actual distance moved, you may also consider other factors such as whether the movement increased the risk of [physical or psychological] harm, increased the danger of a foreseeable escape attempt, gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection.]" (CALCRIM No. 1201.)[fn. 8]

> fn. 8 The corresponding bracketed phrase in CALCRIM No. 1215 is slightly different: "[thus, in addition to considering the actual distance moved, you may also consider other factors such as [whether the distance the other person was moved was beyond that merely incidental to the commission of _____ <insert associated crime>], whether the movement increased the risk of [physical or psychological] harm, increased the danger of a foreseeable escape attempt, or gave the attacker a greater opportunity to commit additional crimes, or decreased the likelihood of detection.]"

> [Petitioner] points to *People v. Martinez* (1999) 20 Cal.4th 225, 237, for the

55

proposition that "contextual factors, whether singly or in combination, will not suffice to establish asportation if the movement is only a very short distance." As argued by [Petitioner] the jury was given no guidance on how to evaluate the evidence of the number of times the baby was moved. She contends this is important because several of the "asportations" were insufficient to support the offense of kidnapping, namely the movement from his home to [Petitioner]'s home before Ana was strangled; from the living room to the bedroom in [Petitioner]'s small apartment before Ana was strangled; from [Petitioner]'s home to the orchard where Ana's body was burned and back to [Petitioner]'s; and to the Walmart where [Petitioner] bought clothes and other baby items for him and then back to [Petitioner]'s.

However, as stated in *People v. Cortez* (1992) 6 Cal.App.4th 1202, 1209, "Kidnapping is a substantial movement of a person accomplished by force or fear" and, "[a]s long as the detention continues, the crimes continue." (*Ibid*.) Here, the evidence at trial revealed no interruption in [Petitioner] and Velarde's detention of Anthony. The kidnapping began when [Petitioner] and Velarde murdered Ana and took her son and ended when they dropped Anthony off on the doorstep of a house several days later, i.e., when the "forcible detention" of Anthony ceased. Each movement of Anthony by [Petitioner] and Velarde while the detention continued was part of the same, continuous offense. (See *People v. Masten* (1982) 137 Cal.App.3d 579, 588, disapproved on other grounds in *People v. Jones* (1988) 46 Cal.3d 585, 600, fn.8.)

Given that evidence was overwhelming that [Petitioner] and Velarde moved Anthony a substantial distance across Merced County, the bracketed portions of CALCRIM Nos. 1201 and 1215 were unnecessary; the jury did not need to consider any other factors in deciding whether the asportation element of kidnapping had been met. (*People v. Martinez, supra*, 20 Cal.4th at p. 237 [if the movement was substantial, the jury need not consider other factors].)

In any event, there is no reasonable probability the jury would have found the asportation element of kidnapping had not been met had it been instructed on the bracketed portions of CALCRIM Nos. 1201 and 1215. (*People v. Flood* (1998)18 Cal.4th 470, 487; *Watson, supra*, 46 Cal.2d at pp. 836-837.) For the same reasons, any error was harmless beyond a reasonable doubt. (*Chapman, supra*, 386 U.S. at p. 24.)

*Ceja*, (F067979), at 43-45.

## 2. The State Court Did Not Err in Instructing the Jury on Asportation

To prove simple kidnapping pursuant to California Penal Code § 207(a), a prosecutor must show that the asportation of the victim was "substantial in character." *People v. Martinez*, 20 Cal.4th 225, 235 (1999) (internal citation and quotation marks omitted). The trier of fact may consider more than "actual distance." *Id*. at 235-37. In *Martinez*, the California Supreme Court held that in a simple kidnapping case, it would be "proper for the court to instruct that, in determining whether the movement is 'substantial in character' [ ], the jury should consider the

56

totality of the circumstances. *Id.* at 237. Therefore,

> in a case where the evidence permitted, the jury might properly consider not only the actual distance the victim is moved, but also such factors as whether that movement increased the risk of harm above that which existed prior to the asportation, decreased the likelihood of detection, and increased both the danger inherent in a victim's foreseeable attempts to escape and the attacker's enhanced opportunity to commit additional crimes.

*Id.*

Here, the trial court instructed the jury to consider "all the circumstances related to the movement" when determining whether the movement of the victim was substantial. However, the trial court did not instruct on the specific factors from Martinez, known as the "contextual factors," which is the bracketed language from CALCRIM Nos. 1201 and 1215.

The Court of Appeal found the trial court did not err in failing to give the contextual factors, given the evidence that Petitioner "moved Anthony a substantial distance across Merced County." *Ceja*, (F067979), at 45. The Court of Appeal noted the kidnapping was continuous and began when Petitioner and Velarde murdered Ana and took Anthony, and ended when they dropped Anthony off on the doorstep of a house. *Id.*

The Court of Appeal determined that even assuming the trial court erred in instructing the jury, any error was harmless. Applying the harmless error standard for federal constitutional error to Petitioner's claim, the Court of Appeal concluded that "there is no reasonable probability the jury would have found the asportation element of kidnapping had not been met had it been instructed on the bracketed portions of CALCRIM Nos. 1201 and 1215." *Id.*

The evidence showed that Anthony moved: (1) from Petitioner's house to an orchard in Snelling, California, where Ana's body was burned and back to Petitioner's home; (2) to Walmart where Petitioner and Velarde bought baby supplies and back to Petitioner's home; and (3) to a doorstep in La Grand, California, when Petitioner and Velarde left Anthony. Additionally, Petitioner's car was found outside Atwater, California, and Anthony's car seat was found in

57

Merced, California. The evidence clearly shows the victim's movements were "substantial" in character. In light of the foregoing evidence, the Court of Appeal's harmless error determination is not unreasonable. For these reasons, the undersigned recommends denying Petitioner's claim.

### D. Uncharged Coconspirator Instruction

Petitioner contends the instruction on an uncharged conspiracy permitted the jury to find her guilty "as an uncharged coconspirator based on overt acts that occurred after the murder was completed." (Doc. 1 at 22.)

#### 1. State Court of Appeal Opinion

The Court of Appeal denied Petitioner's claim, finding no prejudicial error:

> As set forth earlier, the jury was instructed on uncharged conspiracy based on CALCRIM No. 416. The jury was instructed that, in order to find [Petitioner] was a member of a conspiracy, the prosecution had to prove, inter alia, that she "committed at least one of the following overt acts to accomplish murder, kidnapping, and later child endangerment." The instruction listed 12 potential overt acts, including a number of potential overt acts that occurred after Ana was killed.[fn. 7]

> fn. 7 Overt acts after Ana was killed were: (1) aided in disposal of Ana's car; (2) abandoned and burned [Petitioner]'s car; (3) purchased baby paraphernalia at Walmart; (4) proclaimed to family and friends that Anthony was their newborn son; (5) reported [Petitioner]'s car stolen; (6) submitted claim to insurance for loss of [Petitioner]'s car; and (7) abandoned Anthony on door step.

> It is true that "[a]cts committed by the conspirators subsequent to the commission of the crime which is the primary object of the conspiracy are not overt acts in furthers of the conspiracy." (*People v. Tatman* (1993) 20 Cal.App.4th 1, 10.) Based on evidence outlined above, however, there is no reasonable possibility that one or more jurors found [Petitioner] guilty of murder as an uncharged coconspirator based on overt acts which occurred after the murder was complete. (*Chapman*, *supra*, 386 U.S. at p. 24.) We reject [Petitioner]'s claim to the contrary.

*Ceja*, (F067979), at 42-43.

#### 2. The State Court Did Not Err in Instructing the Jury on Uncharged Coconspirators

The jury was given uncharged conspiracy instructions, CALCRIM No. 461, as outlined *supra*. As part of that instruction, the jury was told:

> The defendant committed at least one of the following overt acts to accomplish

Murder, Kidnapping, and Child Endangerment: (a) Invited Victim to defendant's house, (b) Call Defendant Velarde when Victim arrived at their home, (c) Kept Victim occupied and retained her presence while Defendant Velarde traveled from work back home, (d) Held baby while Defendant Velarde strangled Victim, (e) Aided in the disposal of the Victim[']s car, (f) Aided in the disposal of the Victim's body, (g) Abandoned and burned Crown Victoria used to transport Victim's body, (h) Purchased baby paraphernalia at WalMart, (i) Proclaimed to family and friends baby was their newborn son, (j) Reported Crown Victoria stolen to law enforcement, (k) Submitted claim to AAA for loss of Crown Victoria; and (l) abandoned the infant on the door steps of another in the early morning on a cold, December day without warning or notice.

(Clerk's Transcript 8 at 1749-50.)

Of the overt acts listed, only the first three occurred prior to Ana's death. As the Court of Appeal noted, "[a]cts committed by the conspirators **subsequent to the commission** of the crime which is the primary object of the conspiracy are not overt acts in furthers of the conspiracy. *Ceja*, (F067979), at 43 (emphasis added) (quoting *People v. Tatman*, 20 Cal.App.4th 1, 10 (1993)). Consequently, the jury instruction incorrectly instructed the jury about the overt acts the jury could find were committed by Petitioner. While Petitioner is correct that the jury instruction misinformed the jury, Petitioner must do more than prove that the instruction was erroneous. *Henderson*, 431 U.S. at 154.

In addition to the first degree murder conviction, the jury found true the special circumstance allegations that Petitioner intentionally killed the victim by means of lying in wait and that she committed the murder while engaged in the commission or attempted commission of kidnapping.

For the special circumstance of lying in wait, the jury was given CALCRIM No. 728, which read:

The defendant is charged with the special circumstance of murder committed while lying in wait.

To prove that this special circumstance is true, the People must prove that:

1. The defendant was an accomplice or part of a conspiracy to intentionally

59

kill[ ] Ana [ ];

AND

2.  The defendant aided and abetted in the commi[ssion] of the murder by means of lying in wait.

A person commits a murder by means of lying in wait if:

1.  He or she concealed his or her purpose from the person killed;

2.  He or she waited and watched for an opportunity to act;

3.  Then he or she made a surprise attack on the person killed from a position of advantage;

AND

4.  He or she intended to kill the person by taking the person by surprise.

. . .

A person can conceal his or her purpose even if the person killed is aware of the person's physical presence.

The concealment can be accomplished by ambush or some other secret plan.

(Clerk's Transcript 8 at 1764-65.)

Pursuant to CALCRIM No. 731, the jury instruction for the special circumstance of committing murder while engaged in the commission of kidnapping read:

To prove that this special circumstance is true, the People must prove that:

1.  The defendant was a member of a conspiracy to commit kidnapping;

2.  The defendant intended that one or more members of the conspiracy commit kidnapping;

3.  If the defendant did not personally commit kidnapping then another perpetrator, with whom the defendant conspired, personally committed kidnapping;

4.  [ ] Velarde did an act that was a substantial factor in causing the death of another person;

5.  The defendant intended that the other person be killed;

60

6. The act causing the death and the kidnapping were part of one continuous transaction;

AND

7. There was a logical connection between the act causing the death and the kidnapping. The connection between the fatal act and the kidnapping must involve more than just their occurrence at the same time and place.

*Id*. at 1765-66.

A finding that these special allegations are true means the jury found Petitioner guilty of first degree murder based on overt acts that occurred **before** the murder. Therefore, Petitioner has not shown the improper instruction by itself "so infected the entire trial that the resulting conviction violated due process." *Estelle*, 502 U.S. at 72 (internal citations omitted). Therefore, the undersigned recommends denying Petitioner's claim.

### E. Cumulative Error

Finally, Petitioner alleges she was denied her Due Process Rights based on the cumulative effect of the jury instruction errors. Because the undersigned found there were no errors in the jury instructions that had a "substantial and injurious effect" on the verdict, the undersigned recommends denying Petitioner's cumulative error claim.

## VII. The State Court Did Not Err in Denying Petitioner's Ineffective Assistance of Counsel Claim

In Petitioner's fifth ground for habeas relief, she claims her counsel was ineffective by failing to object to the prosecutor's closing argument that jury instructions are not intended to replace what jurors know to be right in their hearts. (Doc. 1 at 24.) Respondent counters that the Court of Appeal reasonably found Petitioner's counsel was not ineffective and made a tactical decision not to object during the prosecutor's closing argument. (Doc. 19 at 44.)

### A. Standard of Review

The purpose of the Sixth Amendment right to counsel is to ensure that the defendant

receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14 (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686.

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The *Strickland* test requires Petitioner to establish two elements: (1) his attorney's representation was deficient; and (2) prejudice as a result of such deficient performance. Both elements are mixed questions of law and fact. *Id.* at 698.

These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

Establishing a state court's application of *Strickland* was unreasonable under § 2254 is difficult because the standards under *Strickland* and § 2254 are both "highly deferential." *Harrington v. Richter*, 562 U.S. 86, 106 (2011) (quoting *Strickland*, 466 U.S. at 689). "[W]hen the two apply in tandem, review is 'doubly' so." *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)). In the habeas context, under § 2254, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

## B.  <u>State Court of Appeal Opinion</u>

The Court of Appeal rejected Petitioner's claim that her counsel was ineffective by not objecting to the prosecutor's closing argument:

> During closing argument, the prosecutor argued:
>
> > "Now sometimes as lawyers, we make things more complicated than they need to be.  You've probably seen that in this trial, if not in other aspects of your life.  The jury instructions are very, very long, and they encompass all of the law applicable in this case.  [¶]  But the jury instructions are not intended to substitute for your own common sense.  They're not intended to replace what you know right in your very heart and souls as to what took place in this particular crime.  [¶]  This isn't complicated.  You don't need to wade through pages and pages of jury instructions in order to figure out what happened in this case.  You know.  You know what happened.  You've sat here.  You've listened to all of the evidence.  You've heard this testimony.  You know right down to your shoes what happened on December 2nd.  [¶]  She killed Ana.  Whether she put her hands on Ana's throat or not, she was every bit as guilty as Velarde.  Every bit as guilty."
>
> [Petitioner]'s counsel did not object.
>
> *Applicable Law and Analysis*
>
> A prosecutor enjoys wide latitude during closing argument.  (*People v. Williams* (1997) 16 Cal.4th 153, 221.)  His argument may be vigorous and incorporate appropriate epithets as long as it amounts to fair comment on the evidence, and it may include reasonable inferences drawn from the evidence.  (*Ibid.*)  "[W]hen the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion."  (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)  "'In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.  [ ]"  (*People v. Brown* (2003) 31 Cal.4th 518, 553-554.)  Generally, a defendant may not raise a claim of prosecutorial misconduct on appeal unless he timely objects to the alleged misconduct at trial.  (*Samayoa*, *supra*, at p. 841.)
>
> Anticipating the forfeiture rule, [Petitioner] contends she was denied effective assistance of counsel by virtue of counsel's failure to object to the prosecutor's comments.    [Petitioner] contends the prosecutor's statements constituted misconduct because they urged the jury to disregard the law and instructions and listen to their "heart and soul" instead.  But the gist of the prosecutor's comments was not to disregard the law or instructions, but rather to simply emphasize that, when evaluating the evidence, which was strong, the jury not lose sight of their common sense.  (See, e.g., *People v. Boyette* (2002) 29 Cal.4th 381, 427.)
>
> In any event, even if the prosecutor's comments were misconduct, it cannot be said that [Petitioner]'s counsel's failure to object to them constituted ineffective assistance of counsel.
>
> > "A criminal defendant's federal and state constitutional rights to counsel [ ]

63

include the right to *effective* legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different." (*People v. Mai* (2013) 57 Cal.4th 986, 1009; *Strickland v. Washington* (1984) 466 U.S. 688, 690-694.)

The failure to object to evidence or argument "'rarely constitutes constitutionally ineffective legal representation . . . .' [ ]" (*People v. Huggins* (2006) 38 Cal.4th 175, 252; accord *People v. Ghent* (1987) 43 Cal.3d 739, 772-773 [rejecting contention counsel's failure to object during prosecutor's closing argument amounted to ineffective assistance because counsel may have tactically assumed an objection would draw closer attention to the prosecutor's isolated comment]; see also *People v. Harris* (2008) 43 Cal.4th 1269, 1290 [same].) [Petitioner]'s counsel may have chosen not to object to the prosecutor's comments because he did not want to draw further attention to the argument. Thus, [Petitioner] cannot establish her counsel's performance was deficient. (See *People v. Huggins*, *supra*, at p. 252 ["'[I]f the record on appeal fails to show why counsel acted or failed to act in the instance asserted to be ineffective . . . unless there simply could be no satisfactory explanation, the claim must be rejected on appeal.' [ ]"].)

In addition, the jury was instructed with CALCRIM No. 200 that, if they believed the attorneys' comments conflicted with the trial court's instructions, they were to follow the instructions as given by the trial court. The jury is presumed to understand and follow the instructions of the trial court. (*People v. Archer* (1989) 215 Cal.App.3d 197, 204.) And, given the overwhelming evidence of [Petitioner]'s guilt, she cannot show a reasonable probability that she would have fared better had her counsel objected to the complained-of portion of the prosecutor's argument. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1177; *Strickland v. Washington*, *supra*, 466 U.S. at p. 694.)

*Ceja*, (F067979), at 47-49.

## C. Denial of Petitioner's Ineffective Assistance of Counsel Claim Was Not Objectively Unreasonable

Petitioner contends she received ineffective assistance of counsel because counsel failed to object to the prosecutor's statements in closing argument, which Petitioner alleges encouraged the jury to ignore the jury instructions. The Court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Trial counsel may decide to "refrain from objecting during closing argument to all but the most egregious misstatements by opposing counsel on the theory that the jury may construe their objections to be a sign of desperation or hyper-technicality." *United States v. Molina*, 934 F.2d

1440, 1448 (9th Cir. 1991).

The prosecutor stated, "the jury instructions are not intended to substitute for your own common sense. They're not intended to replace what you know right in your very heart and souls as to what took place in this particular crime." *Ceja*, (F067979), at 49. As the Court of Appeal noted, "the gist of the prosecutor's comments was not to disregard the law or instructions, but rather to simply emphasize that, when evaluating the evidence, which was strong, the jury not lose sight of their common sense." *Id*. at 48 (internal citation omitted). The prosecutor's statements were not so egregious as to warrant habeas relief.

Even if counsel's failure to object was unreasonable, the record establishes it did not prejudice Petitioner. The jury was instructed pursuant to CALCRIM No. 200, which states, in relevant part, "[y]ou must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." (Clerk's Transcript 8 at 1727). "A habeas court must presume that jurors follow the jury instructions." *Doe v. Busby*, 661 F.3d 1001, 1017-18 (2011) (internal citations omitted). Because the jury was told they must follow the jury instructions as given by the trial court, and the Court presumes the jury followed those instructions, Petitioner cannot show she was prejudiced by her attorney's failure to object to the prosecutor's statements in closing argument.

For the foregoing reasons, the undersigned recommends denying Petitioner's ineffective assistance of counsel claim.

## VIII.  **Recommended Relief**

The undersigned has concluded that Petitioner is entitled to relief on his first claim raised in this petition.

Federal district courts have broad discretion in conditioning a judgment granting habeas relief. *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987). Pursuant to 28 U.S.C. § 2243, federal courts

have the authority to dispose of habeas corpus matters "as law and justice require." "In modern practice, courts employ a conditional order of release in appropriate circumstances, which orders the State to release the petitioner unless the State takes some remedial action, such as to retry (or resentence) the petitioner." *Harvest v. Castro*, 531 F.3d 737, 741-42 (9th Cir. 2008) (citing *Wilkinson v. Dotson*, 544 U.S. 74, 89 (2005)); *Hilton v. Braunskill*, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court."). "[C]onditional orders are essentially accommodations accorded to the state, in that conditional writs enable habeas courts to give States time to replace an invalid judgment with a valid one. The consequence when the State fails to replace an invalid judgment with a valid one is always release." *Harvest*, 531 F.3d at 742 (internal quotation marks and citations omitted).

Accordingly, the Court recommends that Petitioner be ordered released within ninety (90) days of the adoption of the instant findings and recommendations by the District Court Judge unless Respondent notifies the Court of the state's intent to retry Petitioner.

**IX.    Conclusion and Recommendation**

Based on the foregoing, the undersigned recommends that the Court grant the petition for writ of habeas corpus on claim one and recommends Petitioner be granted conditional release.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1). Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court. The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's

order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **November 12, 2018**                                    /s/ *Sheila K. Oberto*
                                                           UNITED STATES MAGISTRATE JUDGE